UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
MCALLISTER OLIVARIUS
                    PLAINTIFF(S)

                                        -v-

MERMEL
                    DEFENDANT(S)

------------------------------------------------------- X

17c9941(JSR)

Hon. Jed S. Rakoff

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/18

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
## MARK MYERS MERMEL
## <u>MOTION TO DISMISS THE COMPLAINT</u>

M. Myers Mermel
*Acting in a Pro Se Capacity*
654 Madison Avenue
Suite 1605
New York, New York 10065
212-943-7777 telephone
<u>mmm@tenantwise.com</u> email

TABLE OF CONTENTS

PRELIMINARY STATEMENT ………………………………………………….....5

STATEMENT OF FACTS…………………………………………………………..8

    A.  McAllister Olivarius's Claims……………………………………………….11

LEGAL ARGUMENT……………………………………………………….……..15

      I.     Plaintiff's Action Is Procedurally Defective and Court lacks Subject Matter Jurisdiction …………………………………………………………….……15

      II    McAllister Olivarius Fails to State a Claim Upon Which Relief May Be Granted………… ……………………………………………..…….…19

            A.  The Plaintiff's Mark Is Not Distinctive……………………………….21

            B.  The Defendant's Domain Name Is Not Identical Or Confusingly Similar…………………………………………………………...…22

            C.  The Defendant Did Not Act With Bad Faith Intent To Profit…………...24

CONCLUSION………………………………………………………….…….....28

TABLE OF AUTHORITIES

CONGRESSIONAL LEGISLATION

S. Rep. No. 106-140, (1999)………………………………………………..………..19

FEDERAL COURT CASES

*Arbaugh v. Y & H Corp.,*
    546 U.S. 500 (206)……………………………………………………..……16

*Bally Total Fitness Holding Corporation v. Andrew S. Faber,*
    29 F. Supp. 2d 1161 (C.D.Cal., Nov. 23,1998)……………………………..……….23

*Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.,*
    No. 11 Civ. 0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011)……...…….……….25

*Bihari v. Gross,*
    119 F. Supp. 2d 309, 318 (S.D.N.Y. 2000)………………………………………....…....21

*Bosley Med. Inst., Inc. v. Kremer,*
    No. 01-1752 WQH (JMA), 2004 U.S. Dist. LEXIS 8336 (S.D. Cal. Apr. 30, 2004)…..……26

*Canadian Overseas Ores Ltd. V. Compania de Acero del Pacifico S.A.,*
    727 F.2d 274 (2d Cir. 1984)…………………………………………………………16

*Conner v. Salzinger,*
    457 F.2d 1241, 1243 (3d Cir. 1972)………………………………………..……....16

*Ex parte McCardle,*
    74 U.S. 506, 7 Wall. 506, 19 L. Ed. 264 (1869)…………………………… ……...…17

*Gully v. First National Bank,*
    299 U.S. 109 (1936)………………………………………………………….....17

*John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,*
    588 F. 2d 24 (2d Cir. 1978)……………………………………………..…….17

*Lane Capital Mgmt. v. Lane Capital Mgmt.,*
    192 F. 3d 337, 345 (2nd Cir. 1999)………………………………………….……....22

*Louisville & Nashville R. Co. v. Mottley,*
    211 U.S. 149 (1908)……………………………………………………..……17

*Lucent Techs., Inc. v. Lucentsucks.com,*
    95 F. Supp. 2d 528, 535 (E.D. Va. 2000)...........................................................23

*Mansfield, C. & L.M.R. Co. v. Swan,*
    111 U.S. 379 (1884)..................................................................................16

*Mayflower Transit, LLC v. Prince,*
    314 F. Supp. 2d 362, 367 (D.N.J. 2004)..........................................................20

*Shamrock Oil & Gas Corp. v. Sheets,*
    313 U.S. 100, 104 (1941)............................................................................15

*Skelly Oil Co. v. Phillips Petroleum Co.,*
    339 U.S.667 (1950)...................................................................................18

*Steel Co., v. Citizens for a Better Environment,*
    523 U.S. 83 (1998)...................................................................................17

*Taubman Co. v. Webfeats,*
    319 F. 3d 770,776 (6th Cir. 2003).................................................................23

*T.B. Harms Co. v. Eliscu,*
    226 F. Supp. 337 (S.D.N.Y. 1964)................................................................17

*The Ladies Room, Inc. v. Gingrich Estate,*
    No. 08-1267, 2008 U.S. Dist.  LEXIS 54605 (E.D. Pa. July 17, 2008).......................16

## TREATISES

5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure*...... ...... ...... ......16

## BOOKS/PERIODICALS

Raboteau, Alfred. *Slave Religion: The "Invisible Institution" in the Antebellum South.*
Oxford: Oxford University Press, 1978..............................................................26

Rakoff, Jed S. "Why You Won't Get Your Day In Court."
*The New York Review of Books* 63 no.18 (November 24, 2016)...............................27

Defendant, Mark Myers Mermel, ("Mermel" or "Defendant") pursuant to Rule 12(b)1 and Rule 12(b)6, respectfully submits this Memorandum of Law dated February 14, 2018, in support of its Motion to Dismiss the complaint filed by Plaintiff, McAllister Olivarius ("McAllister" or "Plaintiff") dated December 20, 2017 (the "Complaint" or "CMPLT"). As set forth below, dismissal is merited as (i) the Plaintiff's complaint is procedurally defective; (ii) the court lacks subject matter jurisdiction; and, (iii) the Complaint also otherwise fails to state a cause of action.

## PRELIMINARY STATEMENT

This is a dispute about legal fees, billing and malpractice that originated and continues in the courts of Connecticut. In 2012, Defendant's email server was hacked and spurious emails were sent to members of the Yale University community without Defendant's knowledge. As a result, Defendant was accused of harassment at Yale University. Defendant reported the crime to the NYPD and engaged Plaintiff to defend him. After months of legal negotiation, yet without a trial, Defendant was exonerated of all allegations and was offered a monetary settlement by Yale.

Plaintiff charged approximately $205,775 for their services over a two-year period. Defendant paid approximately $117,190 and was late in paying the approximate remaining $88,585. Within months of being late in payment, Plaintiffs issued new demands for multiplied payment, citing language in the engagement agreement that would supposedly allow them to add interest and fees and bring the $88,585 to over $300,000 [cf., a penalty rate of 12% yields only $124,455 for three years]. Recent demands by Plaintiff have now increased the same $88,585 to over $672,000.

At the onset of the usurious demands, Defendant questioned why Plaintiff's firm had failed to collect the approximately $60,000 monetary settlement offered Defendant and why Plaintiff had used hundreds of hours crafting letters and pursuing dead-end avenues. The settlement if collected would have defrayed a large part of the remaining bill. Defendant discovered that when Defendant engaged the lead attorney, Ann Olivarius, she was under a period of licensure revocation in New York, and was never licensed to practice in Connecticut. Plaintiff had never informed Defendant of the disbarment as required by law. Yale University undoubtedly knew of it as Ann Olivarius, in promotion of her legal practice, advertised herself prominently as a *summa cum laude* Yale graduate. The secret meetings between Olivarius and Yale to which Defendant was excluded made sense in retrospect, as Plaintiff did not want Defendant to become aware of her practice of law without a license and Yale's position towards her. Other instances of professional misconduct became apparent to Defendant with more investigation. It became apparent to the Defendant that Plaintiff's lack of standing and checkered professional history hurt Defendant in negotiations with Yale. If this was not bad enough, Plaintiff, at the end of the engagement, concocted a scheme to vastly multiply the amount they were owed. Based on information gained from court records, Plaintiff has a long history of litigating against clients and former employers.

Defendant bought a domain name which added the suffix "truth" to the names of McAllister Olivarius in June 2016, www.mcallisterolivariustruth.com. Defendant purchased dummy/filler/blank content of four pages from GoDaddy for $12.00, posted no advertising or contact information, and received no commercial gain. The site was not identical or confusingly similar to any of the domain names of the four websites used by Plaintiff. The legal practice of Plaintiff is known as MCO Law. The name of persons McAllister or Olivarius are not famous or

distinctive. The mark of McAllister Olivarius is not famous, and regardless Defendant makes fair use of it in his "name-suffix" domain name. Defendant did not gain any commercial advantage from it nor did he ever propose to do so. Defendant's speech is protected by the First Amendment as well as expressly within the Anti-Cybersquatting statute as criticism or parody. Defendant had one remark of criticism on the four pages of dummy/filler/blank content and intended to publish public records of Olivarius's professional record as more criticism, but, after receiving extensive legal threats from McAllister Olivarius vowing lawsuits over slander and defamation, Defendant never did publish the public documents. The dummy/filler/blank content was removed in July 2017, and the domain name cancelled thereafter by Defendant.

Plaintiff has alleged Cybersquatting in two separate efforts to join a debt collection complaint in Connecticut and has been denied twice. Plaintiff states that the engagement agreement between the parties is governed by Connecticut law only and has asserted the jurisdiction of the Connecticut state court over all matters with Defendant in their own pleadings.[1] Plaintiff is now attempting to remove the action to Federal Court without adding any new claims or asserting new facts, multiplying the proceedings in an effort to financially burden Defendant and force him to agree to pay the seven-fold multiplied fees they now demand. Even if the count of cybersquatting alleged could be removed by Plaintiff to the District Court, the Plaintiff fails to state a cause of action. Defendant bought the domain name in good faith under rights protected by the First Amendment and Anti-Cybersquatting Consumer Protection Act.

---

[1] In *McAllister Olivarius v. M. Myers Mermel,* Superior Court, J.D. Of New Haven, State of Connecticut, Docket NO. NNH-CV-16-16-6062882-S, Amended Complaint, filed June 27, 2017, Plaintiffs assert "Venue in this Court (Superior Court of the State of Connecticut) is proper pursuant to the forum selection clause of the Engagement Letter set forth below," p 2, Paragraph 1.

Plaintiff has brought this action to further its own efforts to punish and vex Defendant and cause him to pay the multifariously inflated and unlawful amount they now demand of him for prior work. Plaintiff is using the Federal court merely as their sword: if Plaintiff really was concerned that Defendant caused them injury the Plaintiff would have (i) added the cybersquatting count to the original debt collection complaint in New Haven Superior court over eighteen months ago; (ii) would have taken action to correctly serve the defendant within a period of one month in this matter; (iii) would have been physically present for the Federal Court conference; (iv) would have truly engaged Fred Weiss, Esq. as co-counsel and not limited counsel as Weiss first stated then corrected in conference, and finally; (iv) would not have raised allegations that on a simple examination do not state a cause of action.

Accordingly, for the reasons stated in the Memorandum of Law, the Complaint should be dismissed in its entirety with prejudice, pursuant to Rule 12(b)1 or 12(b)6, on the grounds that the Complaint is procedurally defective, Court lacks subject matter jurisdiction, and McAllister Olivarius has otherwise failed to state a claim upon which relief may be granted.

## STATEMENT OF FACTS

McAllister Olivarius is one name of a law firm with offices in Maidenhead, England and a mail drop in a temporary office space provider in Saratoga Springs, New York. McAllister Olivarius filed a complaint in New Haven County Superior Court, State of Connecticut on May 20, 2016, against the Defendant, claiming unpaid legal fees related to legal representation. [2] The complaint

---

[2] *McAllister Olivarius v. M. Myers Mermel*, Superior Court, J.D. Of New Haven, State of Connecticut, filed May 20, 2016. Docket NO. NNH-CV-16-16-6062882-S

sounded two counts of debt collection and quantum meruit. The Plaintiff alleged legal representation from May 2012 to July 2014. Both Jef McAllister and Ann Olivarius, as agents of McAllister Olivarius, and who are married to each other, provided legal services to the Defendant. Defendant had retained McAllister Olivarius due to Ann Olivarius's advertised knowledge of Yale University and her advertised experience in harassment matters. Defendant was exonerated of harassment allegations at Yale and was offered a monetary settlement as compensation.

Attorneys Olivarius and McAllister represented that Olivarius was qualified for the assignment which required licenses to practice in New York and Connecticut. In reality, Olivarius was disbarred in New York, (and also in Washington D.C., and Minnesota), during the period of engagement, and was not and never had been licensed to practice in Connecticut. Her professional record is notable for her four terminations: two from America's two most important financial firms, one from a large endowment, and the last from Shearman & Sterling. The New York State Committee on Professional Standards, her former employers, and former clients all criticize her for deceptive practices and making false statements.[3]

---

[3] See disbarment of Olivarius in New York because she "made materially false statements" and "failed to disclose material facts requested," at *Committee on Professional Standards v. Ann McAllister Olivarius*, No. 0:12-mc-00067-MJD, N.Y.S.3d (App. Div. 2012).

Information regarding further professional misconduct at Goldman Sachs, Shearman & Sterling, Sarnoff Endowment, and under clerkship with U.S. District Judge Marilyn Hall Patel found at Reply in Supp. of Def.'s Mot. for Sanction, *Dr. Ann McAllister Olivarius v. Dr. Daniel Friedman, et. al.*, No. 1:05-CV-00717-JFM (D. Md. Sept. 13, 2005), page 8-12. In this document, the former leadership of the Sarnoff Endowment characterized Olivarius through her consistent pattern of making false statements:

> The Endowment and those affiliated with it (including the Defendants) have become wise to Plaintiff's [Olivaruis's] deceitful ploys over the last 15 years. She is very smart and well-educated, and had great potential as a lawyer. However, she apparently believes she is smart enough to lie herself out of any situation. In the end, Defendants need protection from her dangerous, spiteful, and expensive antics.

Additional history of deceptive and spiteful practices found at Def's Resp. in Opp'n to Ann Olivarius' Mot. to Appear Pro Hac Vice, *Monica Ainhorn Morrison v. University of Miami, et. al.*, No. 1:15-cv-23856-UU (S.D. Fla. Oct. 23,

This history was unknown to Defendant when he hired Plaintiff because the advertised claims made by the Plaintiff over its four websites paint a very different picture. In May 2017, Defendant filed his answer in Connecticut alleging the legal representation for which Plaintiff was claiming fees was compromised by legal malpractice, including failure to collect an offered monetary settlement; the unauthorized practice of law; and the violation of the Connecticut Unfair Trade Practices Act by their fee collection practices, including but not limited to increasing their demand for fees owed after the conclusion of the work from $88,805 to over $672,000, over a seven-times increase. The Defendant has claimed damages.

As described in the Complaint, the Plaintiff filed a Request for Leave to Amend the Complaint in New Haven Superior Court on June 22, 2017 (Entry No.132.00) The Defendant objected to that motion for reasons identical to its objections below and the court sustained the objection on July 25, 2017 (Entry No. 133.10). On July 24, 2017, Plaintiff filed a Second Request to Amend (Entry No. 137.00) with the same legal argument adding only a claim for spoliation of evidence. This Second Request to Amend was denied by the court in an order dated September 25, 2017.

---

2015). See also *Olivarius v. Stanley J. Sarnoff Endowment for Cardiovascular Science*, No 02-CV-471, 02 –CV-813 ,02-CV-814, September 2004, District of Columbia Court of Appeals. Lastl*y, Shearman & Sterling v. Ann Olivarius,* No. 602260-96 (Sup.Ct. N.Y. Court, filed May 1, 1996). Disbarment of Olivarius in the District of Columbia can be found at *In Re Ann Olivarius*, District of Columbia Court of Appeals, N0. 12-BG-1494, May 15, 2014. Disbarment of Olivarius in Minnesota can be found at *In Re Ann McAllister Olivarius,* U.S. District Court of Minnesota, 0:12-mc-00067-MJD, filed August 15, 2012.

### A. <u>McAllister Olivarius's Claims</u>

Approximately six months after the removal of the four pages of GoDaddy dummy/filler/blank content at the domain name www.mcallisterolivariustruth.com, the subsequent cancellation of the domain name by Defendant, and a full eighteen months after Plaintiff's initial complaint regarding debt collection, Plaintiff commenced this action alleging violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125 (d).

Plaintiff claims the jurisdiction of the district court under 28 U.S.C. § 1331 and 15 U.S.C. §1121, relying on statutes giving the district courts jurisdiction for civil actions and for trademarks. For reasons stated below, Defendant believes there is a procedural defect in the removal and the district court lacks jurisdiction under Rule 12(b)1.

Plaintiff claims it is entitled to compensatory and punitive damages, statutory damages, costs and expenses, attorneys' fees, pre-and post- judgement interest; and other relief against Defendant on two grounds: (i) that Defendant created a domain name that "was identical or confusingly similar" to Plaintiff's mark, CLPMT ¶ 25, and (ii) that Plaintiff's mark is distinctive due to the claim of excellent legal representation, "Plaintiff is Widely known for Excellence...." CMPLT, ¶ 1.

In point of fact these allegations are wrong on both counts. First, the mark Plaintiff uses for its primary website is mcolaw.com and this mark is completely different that mcallisterolivariustruth.com. Furthermore, Defendant's domain name is in "name-suffix" form and these forms have been found to be not confusing to the public by the courts. Second, the claim

of "excellence of its practice" is puffery and cannot be proven because the history of the legal practice is checkered. The names of the partners alone are not distinctive or famous.

Plaintiff offers legal services under four websites. The first and primary website is www.mcolaw.com. The second website is www.mcoadvisor.com which offers legal services with another attorney. The third website is www.Rhodesproject.com, which is a portal for legal services dressed up as a fan site for Rhode Scholars operated by Ann Olivarius.[4] The fourth website is www.annolivarius.com another portal for legal services dressed up as a personal brag website. The plaintiff alleges its main website of www.mcolaw as its distinctive mark. This mark is not identical or confusingly similar to www.mcallisterolivariustruth.com on its face.

In reality, the excellence of legal practice claimed by the Plaintiff making its mark distinctive unfortunately does not extend beyond the academic records of the principals whose formal education took place approximately forty years ago. The publicly available professional records of the two principal attorneys at McAllister Olivarius are checkered at best. Jef McAllister spent the bulk of his career as a journalist so it is not clear how active he has been as an attorney. As cited previously, Ann Olivarius's professional conduct has been marred by disbarment in New York, Minnesota, and Washington D.C.; chastisement along with no recommendation from Judge Marilyn Patel for whom she clerked; and termination from the two most important financial firms in America as well as termination from Shearman & Sterling. Since their days at Yale, there have been no notable legal victories won by Olivarius or McAllister that would make their names

---

[4] On the webpage of the Rhodes Project that describes the purpose of the organization entitled "Mission," legal advice from MCO law is prominently and tastefully advertised confirming this is not a website for all things Rhodes but instead a legal portal.

famous. If there were professional legal victories, or even academic articles of note, as chance dictates there might be, these have not risen to the level that the firm is well- known or distinctive, here or abroad.

Plaintiff makes the unsupported allegation that Defendant's website created a situation in which "consumers were likely to confuse or mistake Defendant's fabricated website for the reputable legal services Plaintiff offers to consumers." CMPLT, ¶ 29 It is clear that no one could confuse www.mcallisterolivariustruth.com, with www.mcolaw.com or the other websites. Furthermore, www.mcallisterolivariustruth.com contained only four dummy/filler/blank webpages created by the "Personal Webpage Builder" function from GoDaddy: one page had one sentence of criticism on a dummy page provided by GoDaddy, one had two sample attorney bios provided by GoDaddy, one page had blank contact information format provided by GoDaddy, and the last page was blank. The one sentence of criticism was directed at Jef McAllister by Defendant and said "Hi, Mr Jef!".

Plaintiff alleges that Defendant's "registration and use of domain name was done with a bad faith intent to profit from Plaintiff by extorting it into dramatically reducing the amount due for its services to Mermel in exchange for discontinuing his use of its protected trademark." CMPLT, ¶ 30. This claim of commercial benefit is based on Plaintiff's allegation that Defendant "offered in his email to forgo his planned assault on Plaintiff's character if both parties would simply "walk away" from the unpaid balance or, alternatively, Plaintiff reduced its balance to $44,293, amounting to a sizable profit to Mermel." CMPLT ¶ 18. In reality, this email discussion took place in an email exchange marked for exclusion (exclusion first offered by Plaintiff then reciprocated by Defendant) under Rule 408. Even if Plaintiff tricked Defendant into thinking Plaintiff's "FOR

SETTLEMENT PURPOSES ONLY" header was confidential and it was ultimately to be admitted, Defendant did not offer to sell and these types of discussions have been safe harbored in other similar cases.

Plaintiff acknowledges that it attempted to join this new claim of cybersquatting to its debt collection claim in New Haven Superior Court on June 27, 2017, over a year after the initial complaint was filed and the domain name purchased, and concurrent to the time the dummy/filler/blank content was removed. Plaintiff, by its first amended complaint request, wanted the content removed and when it was done as Plaintiff requested, instead of claiming victory and moving on, Plaintiff tried to amend the complaint a second time with an additional ironic allegation of "intentional spoilation of evidence." CMPLT, ¶ 21. Defendant filed an objection to both requests to amend by Plaintiff.

On September 25, 2017, both attempts by Plaintiff at amendment were dismissed by the New Haven Superior Court. CPMLT, ¶ 22. The Order from Judge Angela Robinson, filed September 25, 2017, which Plaintiff incorporates in its complaint and therefore which can be admitted here reads as follows (Docket: NNHCV166062882S McAllister Olivarius v. Mermel, Mark Myers, Order 45132):

> This action, as initially pled and litigated, is simply a collections matter, asserting that the defendant did not pay for legal services that the plaintiff rendered. More than one year after its initiation, the plaintiff now wishes to add two claims: cyber-squatting and intentional spoliation.
>
> The defendant objects to the Request for Leave to file an Amended complaint, arguing that these claims are not sufficiently connected to the underlying claim; and will make the case unduly complicated.

14

The court agrees. The two new claims are not sufficiently connected to underlying claims to require they be pursued in this matter. They are not necessary for the full adjudication of whether the plaintiff is owed money from the defendant, and if so, how much. Also, as a matter of judicial economy, adding these unnecessary claims will prolong rather than expedite the resolution of the matter.

For these reasons, the court denies the request to file an Amended Complaint.

## LEGAL ARGUMENT

### I.  Plaintiff's Action Is Procedurally Defective And Court Lacks Subject Matter Jurisdiction

Defendant provides two arguments in support of its Motion to Dismiss: 1) Plaintiff is procedurally restricted from removing its cause of action from State Court to Federal Court; and 2) Federal Court lacks subject matter jurisdiction under Rule 12(b)1 as federal law is not an essential element of Plaintiff's claims.

In support of its argument that the Plaintiff is procedurally restricted, Defendant relies on the removal statutes, 28 U.S.C. §§ 1441, 1446. The pertinent portion of 28 U.S.C. § 1441(a) states "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the *defendant or defendants…*" (emphasis added). 28 U.S.C. § 1446 provides the process by which a defendant can remove a civil action to federal court: "A defendant or defendants desiring to remove any civil action from a State court shall file in the district court…" These statutes do not permit a plaintiff to remove its case from state to federal court. The removal statutes, 28 U.S.C. §§ 1441, 1446, authorize removal only by defendants. *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 104 (1941). "It is settled that the cited removal statutes confine the right of removal from a state court to a federal district court to a defendant or

15

defendants." *Conner v. Salzinger*, 457 F.2d 1241, 1243 (3d Cir. 1972) (citing Shamrock, 313 U.S. at 104). Plaintiff's attempt at removal is procedurally defective as only defendants are permitted to remove from state court to federal court. Courts have recognized that denial of a Plaintiff's unlawful effort to remove a matter to state courts conversely allows the Defendant's move to remand, or alternatively, transfer venue back to state courts. See *The Ladies Room, Inc. v. Gingrich Estate*, No. 08-1267, 2008 U.S. Dist. LEXIS 54605 (E.D. Pa. July 17, 2008).

Under 28 USC § 1331, the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. However, Federal Rule of Civil Procedure 12(h)(3) instructs: "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." As this language makes clear, "[t]he objection that a federal court lacks subject-matter jurisdiction may be raised . . . at any stage in the litigation, even after trial." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006); *see also Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984); 5B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1350 ("[I]t has long been well-established that the court's lack of subject matter jurisdiction may be asserted at any time," including after trial and "prior to final judgment," because "Rule 12(h)(3) . . . preserv[es]the defense throughout the action.").

The reason for this "'springs from the nature and limits of the judicial power of the United States,'" which are "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)). "Without jurisdiction, the court cannot proceed at all in any cause. Jurisdiction is power to declare the law,

16

and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co.*, 523 U.S. at 94 (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)); see also *John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 588 F.2d 24, 27 (2d Cir. 1978).

Subject matter jurisdiction is lacking here as federal law is not a part of the Plaintiff's claims: the actions arise from a debt collection effort in the Superior Court in the State of Connecticut. The State court has ruled that this cybersquatting question is related to a debt collection matter and, cybersquatting was not added to Plaintiff's first complaint there filed June 10, 2016.[5] The original complaint alleged only breach of contract and quantum meruit. CMPLT ¶ 19.

Under the well-pleaded complaint rule as exemplified in *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908), it is not enough that a plaintiff asserts a state-based claim that requires the interpretation of federal law, the claim must be part of the original complaint. The Complaint here arises from a breach of contract suit, much like *T.B. Harms Co. v. Eliscu*, 226 F. Supp. 337 (S.D.N.Y. 1964) and similarly, the question here may consider a federal issue but the cause of action here did not arise from that. If the law creating the cause of action was federal, the district court would have jurisdiction; however, the cause here was not federal, accordingly there is no federal question jurisdiction.

This emphasis on the dispositive nature of the original complaint was buttressed in *Gully v. First National Bank*, 299 U.S. 109 (1936) in which Justice Cardoza, writing for the Court, concluded

---

[5] See Order 415132, Nos. 137 and 139 from *McAllister Olivarius v. Mermel, Mark Myers*, NNHCV 166062882S, Superior Court, Judicial District of New Haven, State of Connecticut, September 25, 2017

that the federal question, "must be an element, and an essential one, of the plaintiff's cause of action…and…must be disclosed upon the face of the complaint unaided by the answer or by the petition for removal."[6] Even if the original complaint was not clear, and it is, the court has the authority to establish the true nature of the dispute. The court at times can even look beyond the Plaintiff's Complaint. *Skelly Oil Co. v. Phillips Petroleum Co*. 339 U.S.667 (1950). Regarding the matter at hand, it is a debt collection action revolving around an alleged breach of contract, the Engagement Letter.

Not only does the original action arise under state law, but the terms of the contract between the parties agreed that it would always remain subject only to the laws of Connecticut. The Complaint incorporated the Engagement Letter as Exhibit A; its reference here is permitted here under rules governing 12(b) motions to dismiss. In the Engagement Letter under the heading, "Controlling Law'" McAllister states, "Any dispute or legal issue arising from these terms of business or the engagement letter will be determined by the laws of the State of Connecticut, without reference to the principles of conflicts of law and considered exclusively by Connecticut and US courts."[7] The jurisdiction was specified as only in Connecticut and Plaintiff was careful to exclude New York, where the Complaint now insists the matter belongs, as Attorney Olivarius had just been disbarred in that State. McAllister stated that it should be considered "exclusively by Connecticut and *in the US courts*" (emphasis added). This language does not suggest that "the US courts" are necessarily Federal Courts. Nor does it say Connecticut *or* the U.S. courts, which if it did, would name Connecticut or another court in the U.S. like New York, and which could furthermore be construed to imply the Federal. No, this language as drafted by the Plaintiff means Connecticut in the courts

---

[6] Gully, 299 U.S. 109 (1936), at 112-113.
[7] See Exhibit A of CMPLT.

of America as opposed to in the courts of England where the lawyers McAllister and Olivarius reside and work.

The nature of the dispute was originally and remains a breach of contract action, not a matter regarding cybersquatting. Accordingly, if the Complaint does not fall under the subject matter jurisdiction of the court in 12(b)1, it must be dismissed with prejudice under Rule 12(h)3 or, at the courts determination, remanded under 28 U.S.C. § 1447.

## II.    McAllister Olivarius Fails to State a Claim Upon Which Relief May Be Granted

The Anti-Cybersquatting Consumer Protection Act (ACPA), also known as 15 U.S.C. § 1125(d) was enacted as a section of the Lanham Act S. 43(d) in 1999. The Act was designed to combat domain speculators who registered domain names in order to extract payment from the rightful owners; those who registered domain names with hopes of selling them to the highest bidder; or, those who hoped to divert customers to the cybersquatter's own site which was often commercial or pornographic. See S. Rep. No. 106-140, at 5-6 (1999). The ACPA was intended to combat cybersquatters, but it has been used to target those engaged in criticism or parody known as cybergripers. The intent of the ACPA was not to prohibit criticism or parody.[8]

The ACPA imposes a liability on a person who with a "bad faith intent to profit from" a distinctive or famous mark "registers, traffics in, or uses a domain name" that is "identical or confusingly

---

[8] Id., *supra* note 2, at 9 ("[N]oncommercial uses of the mark, such as for comment, criticism, parody, news reporting, etc., are beyond the scope of the bill's prohibitions…")

similar" to the mark. 15 U.S.C. § 1121 (d)(1)(A). In order to succeed in an ACPA claim, the plaintiff must prove three elements: (i) the plaintiff's mark is distinctive or famous, (ii) defendant's domain name is identical or confusingly similar to plaintiff's mark, and (iii) defendant registered, trafficked in, or used the domain name with a bad-faith intent to profit. *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 367 (D.N.J. 2004). The ACPA provides nine factors for the court to consider in determining whether the defendant had a bad-faith intent to profit.[9]

---

[9] The nine ACPA factors considered include but are not limited to the following:

(I)   the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)   the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)   the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)   the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)   the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)   the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)   the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)   the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)   the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

A. The Plaintiff's Mark Is Not Distinctive

Plaintiff makes a claim for a distinctive mark in its Complaint. CMPLT ¶26. Plaintiff does not claim its mark is famous, a higher standard, instead claiming the lower standard of distinctive. However, the mark of "McAllister Olivarius" is not distinctive in nature. It is two surnames which do not suggest any form of business or consumer product. It is not the mark that is used as the law firm's domain name and trade name. The business calls itself MCO Law and it is found at www.mcolaw.com. There is no separate website for the words "mcallisterolivarius." A prominent section of most websites is the "about" section. On the MCO Law website, this section is titled "About MCO" again repeating the name they call their law practice. Any claims for a distinctive nature of the surname mark based on the law firm's business are unfounded and illegitimate as the law firm does business as MCO Law. Any claims based on the distinctiveness of the surname mark of rests on claims of distinctive relating to the personal names of two of the partners of the law firm.

McAllister Olivarius is two surnames which do not suggest any form of business or consumer product. The relevant code 15 U.S.C. § 1125 (c)(2)(A) defines that a mark is famous when it is widely recognized by the general consuming public of the United States as a designation of a business or consumer product. The names McAllister and Olivarius are not famous or distinctive and are completely unknown to most people in the United States. Accordingly, it does not merit the protections of §1125(d) under which the Plaintiff makes a claim and Plaintiff has no cause for this action. The Plaintiff's claimed mark contains only personal names. Personal names used as trademarks could be protected only if they contain distinctive and secondary meaning. In *Bihari v.*

*Gross* 119 F. Supp. 2d 309, 318 (S.D.N.Y. 2000) the court found that a personal name could be distinctive when linked to a suggestive term, in this case "Bihari Interiors." This term defined a commercial relationship. No such term exists here however. It is not possible to know what type of business McAllister Olivarius is. It could be a grocery, funeral, art gallery, wedding planner, or plumbing concern. It could be any number of things like the name of a public watershed, the name of a geologic fault line, or the name of an arboreal disease. It is not clear that it identifies a business at all.

It is the perception of the public which governs whether a mark is descriptive or not, the ideas of the plaintiff or defendant. In the matter, *Lane Capital Mgmt. v. Lane Capital Mgmt.*, 192 F. 3d 337, 345 (2nd Cir. 1999) the court determined it is the public who decides what constitutes a mark. The public would not understand what McAllister Olivarius constitutes as the term is not descriptive or suggestive. Accordingly, it should not be afforded trademark protections. Without these protections, the Plaintiff's claim is unfounded.

### B. The Defendant's Domain Name Is Not Identical Or Confusingly Similar

Plaintiff offers legal services under four websites. The first and primary website is www.mcolaw.com. The second website is www.mcoadvisor.com which offers legal services with another attorney. The third website is www.Rhodesproject.com, which is a portal for legal services made to appear as a fan site for Rhode Scholars operated by Ann Olivarius.[10] The fourth website is www.annolivarius.com another portal for legal services made to appear as a personal brag

---

[10] On the page of the Rhodes Project that describes the purpose of the organization entitled "Mission," legal advice from MCO law is prominently and tastefully advertised.

website. The plaintiff acknowledges that its main website for business is www.mcolaw. CMPLT ¶ 6. This mark is not identical or confusingly similar to www.mcallisterolivariustruth.com  on its face.

Even if Plaintiff's names were distinctive, which they are not, and even if they conducted business at a domain name composed of McAllister Olivarius which they do not, there is significant case law which has protected the domain names of those who offer criticism or parody in domain names in the "name-suffix" form. These "name-suffix" websites are known in Internet parlance as a "complaint name" and the process of registering and using such names is known as cybergriping.[11] The "name-suffix" form would include those domain names which add the suffixes of "sucks" or "beware" or "truth" or "alert." In contrast to a same name griper, when the ACPA is applied to a "name-suffix" domain name, the courts have found that the "name-suffix" is not identical or confusingly similar. No consumer would believe that "alitaliabeware.com" would be in any way be associated with Alitalia airlines. Rulings in *Lucent Techs., Inc. v. Lucentsucks.com* 95 F. Supp. 2d 528, 535 (E.D. Va. 2000) and other cases like *Bally Total Fitness Holding Corporation v. Andrew S. Faber* 29 F. Supp. 2d 1161 (C.D.Cal., Nov. 23,1998) have supported this understanding. In the matter of *Taubman Co. v. Webfeats*, 319 F. 3d 770,776 (6th Cir. 2003) the court's ruling was clear that holding a "name-suffix" complaint name removes any possibility of confusion under an infringement cause of action.

---

[11] See page 4 of the Ruling from the Sixth Circuit Court of Appeals filed February 7, 2003 regarding *Taubman Co. v. Webfeats*, 319 F. 3d 770,776 (6th Cir. 2003).

## C. The Defendant Did Not Act With Bad Faith Intent To Profit

The Defendant did not act with bad faith to profit. In looking at the nine considerations, under which courts are to determine bad faith, the first three considerations involve the defendant's prior rights to the domain name due to trademark ownership, the defendant's legal name, or the defendant's sale of goods. In this case, Defendant did not sell goods or services on the domain name. The next two considerations involve the nature of the defendant's site, accounting for noncommercial or fair use of the name, and for defendant's intent to lure customers by confusing the public. Defendant posted nothing of a commercial nature on the four webpages that were previously displayed. Defendant had a bona fide criticism of Plaintiff and wanted to show its mistreatment at the hands of the Plaintiff through Plaintiff's inflated and unethical billing practices.[12] Defendant did not attempt to lure customers and offer legal services. There was nothing in the dummy/filler/blank pages to lure or confuse customers. Defendant did not post advertising or links or anything of a commercial nature. The next three considerations involve the defendant's behavior, taking into account offers to sell the domain, defendants use of a false name when registering the name, or the defendant's history of cybersquatting. In this matter, Defendant never attempted to sell the domain name to Plaintiff or to anyone else. Plaintiff does not state that Defendant ever offered to sell in the Complaint because Defendant never offered. Defendant did not use a false name when registering. Defendant also never registered any other names with any connection to the names of mcolaw, mcallister, aoadvisors, olivarius, Rhodes project, or ann olivarius. The last ACPA consideration accounts for the strength of the trademark. As proven

---

[12] See also *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F. 3d 806, 808 (6th Cir. 2004) in which criticism of plaintiff's hasty work was offered.

above, the names of McAllister and Olivarius are not distinctive or famous and do not merit trademark protection.

The Plaintiff makes an unmerited argument that Defendant profited by using the threat of the existence of the domain name in order to pay MCO law less that what it says it was owed. In reality the Defendant disputes that he owes MCO Law as much as they say he does. Since it was described in the CMPLT ¶30, the facts may be incorporated here, seen as Exhibit A. See *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc.,* No. 11 Civ. 0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011).[13] The total bill was approximately $205,775, Defendant paid approximately $117,190 and Defendant had approximately $88,585 remaining. After Defendant was unable to pay on a timely basis, MCO Law used the opportunity to claim the bill was anywhere from $340,000 to $672,000 not $88,585.

In order to buttress its false claim that the Defendant tried to extort the law firm, Plaintiff quoted a letter between the parties that was intended for settlement. Marked "FOR SETTLEMENT PURPOSES ONLY" this email exchange should rightly be excluded as evidence under Rule 408. Because it was referenced in the Complaint, and to reveal Plaintiff's deception, this letter is attached at Exhibit A, as cited previously. It is clear Defendant never asks for money for the

---

[13] Bank of New York Mellon Trust Co. v. Morgan Stanley Mortg. Capital, Inc., No. 11 Civ. 0505, 2011 WL 2610661, at *3 (S.D.N.Y. June 27, 2011):

> In deciding a motion to dismiss, this Court may consider the full text of documents that are quoted in or attached to the complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of fore- stalling the district court's decision on the motion.

website nor does Defendant imply there is a quid pro quo on settlement terms and the domain name. Even if the email was admissible, and it is not, and even if there was some quid pro quo which there was not, a defendant's offer to settle, as seen in the letter, has been upheld by courts as noncommercial. In the matter of *Bosley Med. Inst., Inc. v. Kremer*, No. 01-1752 WQH (JMA), 2004 U.S. Dist. LEXIS 8336 (S.D. Cal. Apr. 30, 2004) the defendant Kremer went so far as to offer a quid pro quo and his domain name was still ruled noncommercial. Similarly, in *Re Mayflower*, the court ruled that the defendant's demand for the company's action was related to defendant's desire for change on the company's part and not a demand for payout.[14] In the matter at hand, Defendant sought to warn others and to use the public record to force the Plaintiff to change its unethical practices, not for Defendant to seek a payout.

The site was noncommercial and it was intended to display ethical and professional histories so reasonable people could choose to hire MCO Law based on all the facts. Law firms should not make false claims, put their interests above a client's interests, and mislead clients about their relevant experience as was the case with MCO Law. At the Defendant's domain name, the dummy/filler/blank content was not commercial but there was one original sentence which was very pointed and highly critical of Plaintiff. It described the relationship of a slave to master as portrayed in Raboteau's landmark book, *Slave Religion,* concerning the manner which the weak and powerless mocked the social structure of their masters.[15] In a similar manner Defendant mocked and criticized Jef McAllister by offering the proper form of deferential personal address "Hi Mr. Jef" to a man, Defendant believes, seeks to profit by taking advantage of others through

---

[14] *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 369 (D.N.J. 2004).

[15] Alfred Raboteau, *Slave Religion: The "Invisible Institution" in the Antebellum South*, (Oxford: Oxford University Press, 1978).

using the system to seize money he did not earn. McAllister was trying to impose a bogus scheme

- not unlike a *post-bellum* scheme - to increase Defendant's bill seven-fold which Defendant had

no chance of paying. In general, attorneys are owed what they are owed, to the extent attorneys

are licensed and can practice fairly and ethically, but they are not owed an amount which is seven-

fold the original bill. Defendant believed evidence of Plaintiff's unethical practices were true,

based on personal experience, and Defendant believed he had the right to speak the truth.[16]

Defendant intended to criticize both McAllister and Olivarius further by publishing all public

documents revealing Plaintiff's disbarment, job dismissals, and misconduct. However, once the

Defendant was challenged by their easy access to courts, their litigious nature with former clients,

and threats from them stating how Plaintiff would use this as another tool to vex the Defendant,

the Defendant then did not extend his criticism by further publishing the public documents.


According to one court observer, it is "the belief of the citizens that the courts are not an institution

to which they can turn for justice, but are simply a remote and expensive luxury reserved for the

rich and powerful."[17] In that vein, what recourse does a citizen have if they are convinced they

have been swindled by so-called "*summa cum laude* Yale attorneys" hiding behind the law and

who seek to impose a theft administered by collection of fake fees and chimerical interest? What

recourse does one have when lawyers use the courts to seek retribution, self-gain, and profit rather

than justice? The resort for the Defendant was the First Amendment and cybergriping with the

hope that by publishing the truth in one small way the Defendant might accomplish a small

---

[16] See Exhibit A ¶10, Defendant stated, "It is not libel if it is the truth and the truth is extraordinarily sobering." Under the ACPA, within 15 U.S.C. § 1125(d)(B)(ii), it states that "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."

[17] Jed S. Rakoff, "Why You Won't Get Your Day In Court," *The New York Review of Books* 63, no. 18 (November 24, 2016)

measure of *tikkun olam*, in this instance, a repairing of the world through the warning of others to avoid MCO Law and its partners McAllister and Olivarius.

## CONCLUSION

For the foregoing reasons, Defendant Mark Myers Mermel respectfully requests that this Court grant its motion to dismiss the Complaint in its entirety with prejudice pursuant to Rule 12(b)1 and Rule 12(b)6, and for further relief as this Court deems just, proper, or equitable.

Dated: New York, New York
      February 14, 2018

By: /s/ M. Myers Mermel

M. Myers Mermel
654 Madison Avenue
Suite 1605
New York, New York 10065
212-943-7777 telephone
*Acting in a Pro Se Capacity*

EXHIBIT A

## Myers Mermel

**Subject:**                          FW: For settlement purposes only [IWOV-Live.FID7232]

**From:** Myers Mermel
**Sent:** Friday, July 01, 2016 6:30 PM
**To:** Jef McAllister
**Cc:** Myers Mermel
**Subject:** RE: For settlement purposes only [IWOV-Live.FID7232]

FOR SETTLEMENT PURPOSES ONLY

Dear Jef,

First, let me directly address an important underlying issue in your recent communication. You make it seem as if I started this dispute. I did not. This started when Ann attacked me and tried to destroy me with trumped up bills. I had been paying and was paying in good faith. At the time, I tried to reach out to you and you washed your hands of me. That hurt. I too had considerable warmth for you—and for Ann for that matter. But I was stunned when Ann demanded 4 times the amount due and threatened immediate legal action if I did not pay. From your recent communication, your demand is now almost 8 times the original bill. Given what I have come to learn, it is hard for me to know the "real Jef" or the "real Ann."

I have tried to maintain my sense of fairness by not actually attempting to destroy your business as you allege. In fact, my incomplete ethics complaint is the reason you avoided the further sanctions. For your information, I have been extending time on submitting my New York complaint only to avoid the necessity of laying out Ann's work history in a public complaint. Regardless of the outcome of our dispute, if published in full, I think this information could cripple if not close your business. I thought you would recognize my good efforts at a level response but I see you did not. I have taken no pleasure in fighting you. But I have to fight you as you haven't given me an option.

I want to make you aware that you are mistaken on a number of fundamental facts. First, my ethics complaint was not without merit. It was terminated by reason of "insufficient evidence." Believe me, they have told me I am welcome to file a new complaint against Ann and/or you and/or your firm. I have been advised that I can file up to another three complaints each in New York, Washington D.C. and Minnesota, states in which Ann was temporarily disbarred/suspended (or subject to revocation as stated by Peter Coffey). I have also been told by insiders that the issue of continued use of the partnership name as defined in Section 806.9(e) is clearly subject to sanction (more proof of this violation was Ann's letter to The US District Court in Minnesota of 6/19/12 and the issues around the *Lobegeiger* case).

Second, no one seems to be afraid or worried about filing these complaints. In fact, since my suit has been outstanding I have been contacted by other parties that wanted my help in pursuing similar complaints against you. Also litigation history shows that Ann has had a surprising number of complaints against her. This work history was known by Yale and it impacted how seriously they took her and, by extension, my matter.

Third, the basic fact remains: Ann was acting as a lawyer in New York during a period in which she had no license. That is unlawful. She also was not admitted in Connecticut. The matter was a New York matter. I lived in New York, the felony hacking took place here, all communication was addressed here, and vital meetings took place here. A claim regarding the jurisdiction of the engagement letter doesn't determine place of the matter.

REDACTED

My response will be three pronged: lawsuit, revised ethics complaints, and internet truth telling. Let me explain. The malpractice lawsuit is straight forward as outlined above. You stated to me that our contract calls for jurisdiction in Connecticut. You can try to defeat the location issue with the Connecticut engagement reference, but the engagement does not say where the matter occurred which was in New York. Also your exact wording states, "and considered exclusively by Connecticut and US courts" indicates that "and US Courts" includes New York. Again your wording.

The new piece is that the complaint will now set forth Ann's full work history in public view. So, using just public documents, it is true that Ann (i) did not get clerk references and that you made them up for her, (ii) was fired for cause from Goldman Sachs, Morgan Stanley, and Shearman & Sterling, (iii) was fired for cause from Sarnoff and the directors actually sued her as did S&S, and (iv) Judge Patel believed Ann "needed professional help before [she does] more serious damage to [herself, her] family or others."

The revised ethics complaints, now with sufficient evidence, will be sent in to the three states in which Ann lost her license because of her misconduct.

Lastly, I will compile the documented information from the complaint to form the subject content of www.mcallisterolivariustruth.com ( it is live online, check it out, just needs content and SEO). Given that I would not have engaged your firm if I knew its full history, I think other potential clients would make the same decision. I believe Ann's work history hurt me in her representation of me. The site will display facts from public documents including elements from : *Morrison* effort for *pro hac vice*, disciplinary misconduct suspension from Third District, disciplinary misconduct suspension from Minnesota, disciplinary misconduct suspension from DC Court of Appeals, *Lobegeiger, Olivarius v Friedman et al, Shearman & Sterling v. Olivarius, Olivarius v. Stanley Sarnoff Endowment, Olivarius v. David Freishtat,* and others. These items are now in the public record, but not available in one place. It is not libel if it is the truth, and the truth is extraordinarily sobering.

I have a plan as outlined above, but I would prefer a just resolution. Since Ann was the key strategist and negotiator, more than half of the engagement was hers. If her remuneration for unlicensed work is excluded from the total, then the payments I have already made should cover the fair cost of the work you did. Rightly, we should both just walk away with you keeping the over $100,000 I have already paid.

Given your recent history I don't think you will accept this offer. Therefore in order to put this behind us now I am willing to borrow money from others to pay you. I think a payment of $44,293 splits the remainder evenly between us. That is generous and more than fair to you. I too have lost money and time defending myself so the cost to me is greater. The cost you incurred was never necessary because I wasn't being a bad guy—I was just short and you never believed me. You cannot expect me to pay for your over reaction. This offer is good for five days, pending releases.

Frankly, it would be cheaper for me to pursue the strategy above. You know I have a legitimate point regarding Yale's knowledge of Ann and her history; it influenced negatively how I was treated. With my offer, I am trying to let all of us go on with our lives. I hope you can do that too.

I distinctly remember that you possess a still small voice that reminds you of the right and just. I hope this equal split I am offering awakens that voice and your better angels.

Have a Happy 4th of July,

Regards,

Myers


**From:** Jef McAllister [mailto:JMcAllister@mcolaw.com]
**Sent:** Thursday, June 30, 2016 2:47 AM
**To:** Myers Mermel
**Subject:** RE: For settlement purposes only [IWOV-Live.FID7232]

Dear Myers

Thank you for your note.  I look forward to hearing from you.

Regards

Jef

**Dr Jef McAllister**
*Managing Partner*

# McAllister
# Olivarius

*Named a Super Lawyer by Thomson Reuters 2014 and 2015*

Pearce Building, 7th Floor | West St | Maidenhead | SL6 1RL | England
5 Wells Street | Saratoga Springs, NY 12866 | USA

Direct Line: +44 (0) 1628 567 555 | Mobile +44 (0) 7711 95 75 65
US number (518) 633-4775 | jmcallister@mcolaw.com | mcolaw.com



---

**From:** Myers Mermel [mailto:mmm@tenantwise.com]
**Sent:** 29 June 2016 23:31
**To:** Jef McAllister
**Cc:** Ann Olivarius
**Subject:** RE: For settlement purposes only [IWOV-Live.FID7232]

Dear Jef,
I am working on a succinct reply and hope to have it to you in the next few days.
Regards,  Myers


**From:** Jef McAllister [mailto:JMcAllister@mcolaw.com]
**Sent:** Friday, June 24, 2016 3:09 PM
**To:** Myers Mermel
**Cc:** Ann Olivarius
**Subject:** For settlement purposes only [IWOV-Live.FID7232]

3

FOR SETTLEMENT PURPOSES ONLY

Dear Myers:

Thank you for reaching out. I think it best that we communicate in writing at this stage. We both understand the issues.

With the end of your attempt to incite disciplinary action against Ann in the Third Department, your New York suit has no merit and will not endure, as I expect your lawyer has told you. Our lawyers believes your lawyer would be ethically challenged filing a complaint in your New York case given the Third Department's decision.

Under the engagement letter, you owe us $348,060 as of today, plus additional interest and any additional costs of the Connecticut suit as it progresses. Our claim against you is sound and straightforward. Your arguments that we failed to do work, deceived you, etc. are hollow and belied by an extensive record and your own writings and actions. The charges you raised in the Third Department will not fly any better in Connecticut. Defending yourself in our collection suit will be expensive and time consuming. Prosecuting the case will not cost us anything because you are contractually obliged to pay us what it costs us to collect from you.

After your attempt to disbar Ann and destroy us, I lost my previous warmth towards you, which I admit used to be considerable.

Your bare-bones outstanding amount due -- with all discounts applied and no interest added -- is $88,586. It has cost us another $84,000 in our time, which we are entitled to charge under the engagement letter, to pursue collection against you and to defend against your specious disciplinary claim in New York,. In addition, we have to pay our liability insurance company's lawyers approximately $6,000 for their work, and my liability insurance rates have gone up another $2,500 per year courtesy of you, probably in perpetuity; let's cap it at five years ($12,500). The total of these supplemental expenses is $102,500. The original bill plus the supplemental expenses is $191,086.

Rounding to make it easy, for a payment of $190,000 in five days and mutual releases, we will drop the Connecticut suit.

According to public records, you bought a $360,000 house in Vermont last year, which looks very nice. I no longer believe you lack resources.

If we go to court you would be obligated to pay most of the $102,500 in supplemental fees described above, on top of the $348K you now owe under the terms of the engagement letter. You would also have to pay the legal fees both you and we incur from now on. The total you will have to pay could easily reach $600,000, and of course you would also have the trouble of a trial.

I have stripped away everything that is not a real cost to us, which given our contract is very generous to you.

Regards

Jef

**Dr Jef McAllister**
*Managing Partner*

# McAllister
# Olivarius

*Named a Super Lawyer by Thomson Reuters 2014 and 2015*

Pearce Building, 7th Floor | West St | Maidenhead | SL6 1RL | England
5 Wells Street | Saratoga Springs, NY 12866 | USA

Direct Line: +44 (0) 1628 567 555 | Mobile +44 (0) 7711 95 75 65
US number (518) 633-4775 | jmcallister@mcolaw.com | mcolaw.com



McAllister Olivarius is a Multinational Partnership authorised and regulated by the UK Solicitors Regulation Authority, registration number 498087 Partners: Dr Ann Olivarius (solicitor of England & Wales and U.S. attorney licensed in Minnesota, New Hampshire, Virginia, the District of Columbia, New York and Idaho); Dr JFO McAllister (Registered Foreign Lawyer, U.S. attorney licensed in Connecticut and New York)

Circular 230 Disclosure: Pursuant to U.S. Treasury Department regulations, we are required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, any review, use, dissemination, distribution, or copying of this email is prohibited. Please notify the sender immediately of the error by return email and please delete this message from your system.

Except in instances in which we have made direct reference above to redlining or "track changes" that are expressly conveyed for review and consideration, it is the intent of the sender to remove all metadata from all attachments to this email, and any metadata that may be found therein has been produced inadvertently and should not be reviewed. Thank you.

McAllister Olivarius is a Multinational Partnership authorised and regulated by the UK Solicitors Regulation Authority, registration number 498087 Partners: Dr Ann Olivarius (solicitor of England & Wales and U.S. attorney licensed in Minnesota, New Hampshire, Virginia, the District of Columbia, New York and Idaho); Dr JFO McAllister (Registered Foreign Lawyer, U.S. attorney licensed in Connecticut and New York)

Circular 230 Disclosure: Pursuant to U.S. Treasury Department regulations, we are required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including attachments and enclosures, is not intended or written to be used, and may not be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, any review, use, dissemination, distribution, or copying of this email is prohibited. Please notify the sender immediately of the error by return email and please delete this message from your system.

Except in instances in which we have made direct reference above to redlining or "track changes" that are expressly conveyed for review and consideration, it is the intent of the sender to remove all metadata from all attachments to this email, and any metadata that may be found therein has been produced inadvertently and should not be reviewed. Thank you.