UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------- X     Case No.: 1:17-cv-09941-JSR
MCALLISTER OLIVARIUS
                    PLAINTIFF(S)


                                    -v-


MERMEL                                              Hon. Jed S. Rakoff
                    DEFENDANT(S)


---------------------------------------------------- X


# REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT MARK MYERS MERMEL'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3|8|18

M. Myers Mermel
*Acting in a Pro Se Capacity*
654 Madison Avenue
Suite 1605
New York, New York 10065
212-943-7777 telephone
<u>mmm@tenantwise.com</u>  email

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................3

PRELIMINARY STATEMENT .............................................................5

LEGAL ARGUMENT

     I.    Plaintiff's Claim Is Barred And Court Lacks Subject Matter Jurisdiction

          A. Removal And *Res Judicata*.............................................9

          B. Plaintiff's Claim Governed by Engagement Agreement...................11

     II    McAllister Olivarius Fails To State A Claim Upon Which Relief May Be Granted Given Insufficiency of Facts Pled and Reasonable Inferences.......13

          A. The Plaintiff's Mark Is Not Distinctive Given Insufficiency Of Facts Pled And Reasonable Inferences...............................................14

          B. The Defendant's Domain Name Is Not Identical Or Confusingly Similar Given Insufficiency Of Facts Pled And Reasonable Inferences..........17

          C. The Defendant Did Not Act With Bad Faith Intent To Profit Given The Insufficiency Of Facts Pled And Reasonable Inferences...................18

    CONCLUSION.........................................................................21

TABLE OF AUTHORITIES

FEDERAL COURT CASES

*A.J. Canfield Co. v. Honickman,*
   808 F.2d 291, 305-306 (3d Cir. 1986)………………………………………...…15

*Allen v McCurry,*
   449 U.S. at 90, 101 S.Ct. 411, 66 L.Ed. 2d 308, (1980)……………………………10

*Ashcroft v. Iqbal,*
   556 U.S. 662 129 S.Ct. 1937, 1949-1950, 173 L.Ed.2d 868 (2009)……………...…13

*Bally Total Fitness Holding Corporation v. Andrew S. Faber,*
   29 F. Supp. 2d 1161 (C.D.Cal., Nov. 23,1998)………………………………………..18

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)………………………………13

*Bihari v. Gross,*
   119 F. Supp. 2d 309, 318 (S.D.N.Y. 2000)……………………………………………16

*Bosley Med. Inst., Inc. v. Kremer,*
   No. 01-1752 WQH (JMA), 2004 U.S. Dist. LEXIS 8336 (S.D. Cal. Apr. 30, 2004).....20

*Federated Department Stores v. Moitie,*
   452 U.S. 394, 101 S. Ct. 2424, 69 L.Ed. 2d 103 (1981)………………………..……...10

*Genesee Brewing Co., v. Stroh Brewing Co.,*
   124 F.3d 137, 143 (2d Cir. 1997)…………………………………………....…15,16

*Kellogg Co., v. National Biscuit Co.,*
   305 U.S. 111, 118, 59 S. Ct. 109, 113, 83 L.Ed. 73 (1938)……………………..……15

*Lane Capital Mgmt. v. Lane Capital Mgmt.,*
   192 F. 3d 337, 345 (2nd Cir. 1999)…………………………………………....…16

*Louisville & Nashville R. Co. v. Mottley,*
   211 U.S. 149 (1908)……………………………………………………..…………...11

*Lucent Techs., Inc. v. Lucentsucks.com,*
   95 F. Supp. 2d 528, 535 (E.D. Va. 2000)……………………………………………18

*Lucas Nursery & Landscaping, Inc. v. Grosse,*
   359 F. 3d 806, 808 (6th Cir. 2004)……………………………………..………19

*Markowitz v. Northeast Land Co.,*
   906 F. 2d 100,103 (3rd Cir. 1990)……………………………………………………13

*Mayflower Transit, LLC v. Prince,*
   314 F. Supp. 2d 362, 367 (D.N.J. 2004)……………………………………….......20

*In re Nutronics, Inc.,*
   28 F. 3d 965, 969 (9th Cir.), cert. denied, 115 S. Ct. 577 (1994)………..…............10

*Papasan v. Allain,*
   478 U.S. 265, 286 (1986)……………………………………………...…….......14

*Pennsylvania ex rel. Zimmerman v PepsiCo., Inc.,*
   836 F.2d 173, 179 (3rd Cir. 1988)……………………...…………………….....13

*Sturm v Clark,*
   835 F. 2d 1009, 1011 (3d Cir. 1987). ………………………………………..…..13

*Taubman Co. v. Webfeats,*
   319 F. 3d 770, 776 (6th Cir. 2003)……………………………………….…......18

*T.B. Harms Co. v. Eliscu,*
   226 F. Supp. 337 (S.D.N.Y. 1964)……………………………………............11

## STATUTES

15 U.S.C. § 1125 (d)(1)(A)(ii)(I)……………………………………………....……..8
15 U.S.C. § 1125 (c)(2)(A)……………………………………………………………17
15 U.S.C. § 1125 (d)……………………………………………………………………17
28 U.S.C. § 1446………………………………………………………………………..9

## RULES

Fed. R. Civ. P.  11(c)(4)………………………………………………....………...21
Fed. R. Civ. P. 12(b)(1)……………………………………………………………5,13
Fed. R. Civ. P. 12(b)(6)……………………………………………………………5,12
Fed. R. Civ. P. 12(h)(3)………………………………………………………......13
Fed. R. Evid. 408………………………………………………………………...19

Defendant, Mark Myers Mermel, ("Mermel" or "Defendant") pursuant to Fed. R. Civ. P. 12(b)1 and Fed. R. Civ. P. 12(b)6, respectfully submits this additional Memorandum of Law dated March 8, 2018, in further support of its Motion to Dismiss dated February 14, 2018. This Memorandum responds to the complaint ("Complaint" or "CMPLT") filed by Plaintiff, McAllister Olivarius ("McAllister" or "Plaintiff") dated December 20, 2017 and a further Opposition to the Motion to Dismiss Memorandum filed by Plaintiff ("McAllister Opposition" or "MOMD") dated March 1, 2018. As set forth below, dismissal is merited as (i) under the doctrine of *res judicata;* (ii) the court lacks subject matter jurisdiction; and, (iii) the Complaint also otherwise fails to state a cause of action.

## PRELIMINARY STATEMENT

This is the third attempt by Plaintiff to litigate the same transaction and occurrence, among the same parties, and in the same positions.[1] The Plaintiff has had not one, but two, days in court already. The Plaintiff has received a final judgement in Connecticut. In order for this litigation to reach an end for the sake of judicial economy, the Court should rightly preclude the claim per case law precedent. Remarkably, the Plaintiff in its Connecticut pleadings concedes that after its first attempt there, Plaintiff could not bring this claim in District Court, as it would be subject to *res*

---

[1] The McAllister Opposition to the Motion to Dismiss memorandum contained 44 typographical errors. See Exhibit A. At the risk of appearing uncharacteristically uncharitable or even churlish, the Defendant mentions this to make a point. McAllister argued in its Complaint that its distinctiveness derived from its reputation for "Excellence in...Law" based on the fact that its two married partners, Mr. John E. F. McAllister and Mrs. Ann McAllister Olivarius, were *summa cum laude* Yale Law graduates and Marshall and Rhodes Scholars respectively. Are we not right to expect a somewhat higher technical standard from those who claim the excellence of the finest legal and educational pedigree this country can confer? As discussed below, should we also not expect to see a reasonable, if not higher, ethical standard? The point of highlighting these errors is simply this: McAllister is capable of work with less errors, but it is evident that it cares little about the quality of its work here because it cares only that the work drags on.

*judicata*.[2] The Plaintiff conceded this claim would be precluded in this court from the get-go, but they brought it away. The U.K.-based Plaintiff demeans an important District Court by using this matter for harassment at the expense of the Court's time. Plaintiff's real goal in opposing the Motion to Dismiss is only to continue the legal process, wear down the Defendant, and cause Defendant to accede to its outrageous demands for payment in continuing litigation in Connecticut court. The relief sought here is not the offline removal of the cyber griping site as is typical in Anti-Cybersquatting Consumer Protection Act ("ACPA") claims, because it has already been removed; or the recovery of profit, because there was no profit made by Defendant; or even the recovery of damages, because there were none. It is only the opportunity to intimidate and beleaguer a former client and the added bonus of a chance to generate additional hours, fees, costs, expenses, interest and any other emoluments which might be meted out against him. This unethical goal is consistent with the technical errors which leap out of the McAllister Opposition Memorandum. The logical fallacies and tortured structure of its arguments make clear the Plaintiff will argue anything to escape the reasonable conclusion of the Motion to Dismiss. As will be examined below, their pled facts and reasonable inferences are not sufficient to state a claim upon which relief can be granted. From Defendant's reading, this standard is not a high bar for most Plaintiffs to meet. However, no amount of additional information could ever make these facts sufficient to substantiate a claim upon which relief could be granted. The Connecticut state court has weighed the Plaintiff's initial and amended request to amend its complaint in order to join the ACPA claim to the original debt collection matter. The Connecticut court rejected both claim joinders after the full airing of the ACPA claim. The Connecticut court rejected the ACPA claim

---

[2] Exhibit B, page 2, 3

not only because the claim was unrelated but also, more importantly, because the claim was found unmerited after the court's examination.

Plaintiff in its response does not dispute Defendant's Motion to Dismiss assertion that the Engagement Agreement places all disputes in the State of Connecticut and not in Federal Courts. The Plaintiff might have argued otherwise but it has conceded that point. In order to escape the conclusion that the matter remain in Connecticut, however, Plaintiff now has a single argument: Defendant is estopped from arguing the ACPA is *related* to the Engagement Agreement by virtue of Defendant's prior argument in the Connecticut action that the ACPA is *unrelated* to the Engagement Agreement. But, the Plaintiff is the master of her own complaint. Plaintiff argued strongly in Connecticut that the state had jurisdiction. The application of judicial estoppel is warranted only if it applies to the actions of the Plaintiff first and foremost. It is the Plaintiff who has changed her mind for advantage not the Defendant. The Plaintiff brought the ACPA in Connecticut court twice, and only after two denials did it seek to remove it to District Court. The facts are that Plaintiff originally believed the ACPA was a state issue governed by the Engagement Agreement, and that is why it brought the matter twice in Connecticut and never in eighteen months before a Federal Court. *Res judicata* and claim preclusion now rightly prevent this matter from being brought into District Court. The losing Plaintiff now asserts that the claim denials in Connecticut were based solely on the unrelated nature of the ACPA claim. They were not. The real reason they were denied is that the court in Connecticut considered the ACPA claim and found it unmerited on its face. The Connecticut court saw the ACPA action for what it was: an "unnecessary" and meritless *ex post facto* claim made as a shallow retaliatory attempt to punish and vex Defendant in the ongoing Connecticut debt collection/malpractice matter. The estoppel

argument against the Defendant further fails because the Defendant has always held the consistent position that the ACPA claim was both meritless and unrelated. Plaintiff has no other arguments against the authority of the Engagement Agreement except for insights discerned under a test under a recent Connecticut case, which does not govern the District Court's decision.

As for the actual merits of its now thrice-litigated ACPA claim, Plaintiff argues that its facts alone, presumed to be true, state a claim upon which relief can be granted. However, the facts and inferences are insufficient to state a claim even when accorded to be true. This is what the Connecticut court has ruled twice. The Plaintiff must meet all three parts of a three-part test under the ACPA and on the face of it, the Plaintiff's Complaint does not meet any one of the three tests. It fails the first test squarely. In the first test, the Plaintiff alleges a distinctive trademark. But the facts and inferences are that the two surnames are not distinctive even under the secondary meaning test the Plaintiff mentions. No amount of discovery will ever change that fact. The second test of ACPA is for the domain names being identical or confusingly similar. Plaintiff alleges that "the marks" not domain names are confusingly similar by citing a subsection of the ACPA entitled Cyberpiracy Prevention. This section of the ACPA is concerned with domain names containing distinctive and famous marks, not generic marks. The language cited regarding "marks" exists in a subsection, 15 U.S.C. § 1125(d)(1)(A)(ii)(I) but only if those names are distinctive. Under ACPA, the domain names in question must contain a mark in a domain name that is confusingly similar to the Plaintiff's distinctive mark. Defendant's domain name www.mcallisterolivariustruth.com is not confusingly similar to the www.mcolaw.com domain name, which is the domain of the law practice. The domain name of www.mcallisterolivarius.com does not exist. The claim that the surnames of the partners alone constitute a distinctive mark is

insufficient as proved in the first test, so Defendant's domain name containing surnames as a component of the domain name also is not valid. Additionally, the form of "name-suffix" sites as used by Defendant are protected as criticism or parody under statute. Lastly, the third test under ACPA is bad faith with intent to profit. Defendant's cyber griping site had no commercial value, the Defendant never crossed safe harbor borders, never asked for money to remove the site, had no links and/or advertising, made no money from site, and offered no services. All these facts prove it had no bad faith to profit just a desire to criticize under its First Amendment rights.

### Plaintiff's Claim Is Barred And Court Lacks Subject Matter Jurisdiction

### A. Removal and *Res Judicata*

McAllister contends no action was ever brought in the Connecticut court, and, as such, there is no state court action to remove. 28 U.S.C. §1446, the procedure for removal, allows for defendants to remove actions within 30 days of service of initial pleading or service. By the statute's own definition an action comes into being if there has been service. Service is the trigger which creates an action under this statute, and within a short thirty-day window from it, not at some point later in the procedural process. Defendant believes Plaintiff's conceded Request to Leave joinder amendments in Connecticut are downriver of the trigger of service. However, Defendant may be plowing new legal and ontological ground which is not necessary here given the other established doctrines which govern the case, and Defendant would like to examine those other doctrines.

Plaintiff attempted to join the ACPA claim to its existing action of debt collection in Connecticut state court on July 11, 2017 and July 21, 2017. See Exhibit B which shows Plaintiff's reasons for wanting to file an amended claim joinder. After being denied joinder of both the original ACPA

claim and the amended ACPA claim with spoliation in September 2017, Plaintiff decided to file an ACPA claim in District Court in December 2017. This claim should be barred by claim preclusion under the doctrine of *res judicata.* Plaintiff actually conceded in its Connecticut pleadings that the amended filing would prohibit Plaintiff from bringing the ACPA claim in another jurisdiction as it would be barred by preclusion. See Exhibit B, page 2-3. Within Plaintiff's Reply to Objection to Amend, it states, *"If Plaintiff had instead waited and brought a separate lawsuit alleging cybersquatting, Defendant presumably would have argued the second case constitutes a waste of judicial resources and should be precluded under the doctrine of res judicata"* (emphasis added). Yes, the position that Plaintiff conceded is exactly the position which Defendant is arguing. The Plaintiff here is the master of her own complaint. It was Plaintiff who chose to pursue this claim in Connecticut state court twice. Courts have ruled that in cases (i) involving the same claim; (ii) having a valid and final judgment on the merits, and; (iii) where the two cases are between the same parties, claim preclusion applies. On the basis of issue preclusion alone, the ACPA claim is now on its third try in this Court. The denial to amend the Complaint in the Connecticut court, both times, was on the merits. There is substantial case law on claim preclusion from cases where the first court is a state court and the Plaintiff, after a denial of joinder motions, attempts to retry the same case in Federal court. *Res judicata* relieves parties of costs and multiple lawsuits, conserves judicial resources, and prevents inconsistent decisions by encouraging reliance on adjudication. *Allen v McCurry*, 449 U.S. at 90, 101 S Ct. 411, 66 L.Ed. 2d 308, (1980). *Res judicata* bars a party from bringing a claim if a court of competent jurisdiction has rendered final judgment on the merits in a previous action involving the same parties and claims. *In re Nutronics, Inc.,* 28 F. 3d 965, 969 (9th Cir.), cert. denied, 115 S. Ct. 577 (1994). More complicated and nuanced cases exist like *Federated Department Stores v. Moitie* 452 U.S. 394,

101 S. Ct. 2424, 69 L.Ed. 2d 103 (1981) in which preclusion barred some plaintiffs because they did not bring the state cause of action with the federal cause of action. It is clear that Plaintiff's actions are like many other Plaintiffs before it which have been barred and precluded.

### B. Plaintiff's Claim Governed by Engagement Agreement

Subject matter jurisdiction is lacking here as federal law is not a part of the Plaintiff's claims: the actions arise from a debt collection effort in the Superior Court in the State of Connecticut. The State court has ruled that this cybersquatting question is related to a debt collection matter, and cybersquatting was not added to Plaintiff's first complaint there filed June 10, 2016.[3] The original complaint alleged only breach of contract and quantum meruit. CMPLT ¶ 19.

Under the well-pleaded complaint rule as exemplified in *Louisville & Nashville R. Co. v. Mottley*, 211 U.S. 149 (1908), it is not enough that a plaintiff asserts a state-based claim that requires the interpretation of federal law, the claim must be part of the original complaint. The Complaint here arises from a breach of contract suit, much like *T.B. Harms Co. v. Eliscu*, 226 F. Supp. 337 (S.D.N.Y. 1964) and similarly, the question here may consider a federal issue but the cause of action here did not arise from that.  If the law creating the cause of action was federal, the district court would have jurisdiction; however, the cause here was not federal, accordingly there is no federal question jurisdiction.

---

[3] See Order 415132, Nos. 137 and 139 from *McAllister Olivarius v. Mermel, Mark Myers,* NNHCV 166062882S, Superior Court, Judicial District of New Haven, State of Connecticut, September 25, 2017

Not only does the original action arise under state law, but the terms of the contract between the parties agreed that it would always remain subject only to the laws of Connecticut. The Complaint incorporated the Engagement Letter as Exhibit A; its reference here is permitted here under rules governing Fed. R. Civ. P 12(b)(6) motions to dismiss. In the Engagement Letter under the heading, "Controlling Law" McAllister states, "Any dispute or legal issue arising from these terms of business or the engagement letter will be determined by the laws of the State of Connecticut, without reference to the principles of conflicts of law and considered exclusively by Connecticut and US courts."[4]

Plaintiff in its response does not dispute Defendant's Motion to Dismiss assertion that the Engagement Agreement places all disputes in the State of Connecticut and not in Federal Courts. The Plaintiff might have argued otherwise, but it has conceded that point. Plaintiff now has only one argument to avoid the Motion to Dismiss. This is that the Defendant is estopped from arguing that the ACPA is related to the Engagement Agreement when Defendant said it was unrelated in Connecticut litigation. But, again the Plaintiff is the master of her own complaint. Plaintiff argued strongly in Connecticut that the state had jurisdiction. The Plaintiff stated in its Connecticut pleading in Exhibit B, p 2, that the link between the Engagement Agreement and the courts of Connecticut "…is clear and direct. Absent the breach of contract there would have not been a lawsuit, and absent the lawsuit, Defendant would not have created his disparaging and misleading website." The Plaintiff in its own pleadings has cemented the pedigree of the ACPA claim to the breach of contract suit which originated in Connecticut.

---

[4] From Defendant's Motion to Dismiss, dated February 14, 2018, see Exhibit A of CMPLT.

The application of judicial estoppel applies to the actions of the Plaintiff in large measure. It is the Plaintiff who has changed its mind for advantage not the Defendant. The Plaintiff brought the ACPA in Connecticut court twice, and only after two denials did it seek to remove it to District Court. The facts are that Plaintiff, by its own admission, originally believed the ACPA was a state issue governed by the Engagement Agreement, and that is why it brought the matter twice in Connecticut and never in eighteen months before a Federal Court.

The nature of the dispute was originally and remains a breach of contract action, not a matter regarding cybersquatting. Accordingly, if the Complaint does not fall under the subject matter jurisdiction of the court in Fed. R. Civ. 12(b)1, it must be dismissed with prejudice under Fed. R. Civ. P. 12(h)3.

## II.    McAllister Olivarius Fails To State A Claim Upon Which Relief May Be Granted Given Insufficiency of Facts Pled and Reasonable Inferences

A motion to dismiss tests the legal sufficiency of a claim accepting the veracity of the claimant's allegations. *Markowitz v. Northeast Land Co.*, 906 F. 2d 100,103 (3rd Cir. 1990); *Sturm v Clark*, 835 F. 2d 1009, 1011 (3d Cir. 1987). A complaint may be dismissed, however, when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. *Pennsylvania ex rel. Zimmerman v PepsiCo., Inc.,* 836 F.2d 173,179 (3rd Cir. 1988). Pleading standards have been heightened in the last decade by the rulings *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and *Ashcroft v. Iqbal* 556 U.S. 662 129 S.Ct. 1937, 1949-1950, 173 L.Ed.2d 868 (2009). In *Ibqal* if "bare assertions" are "conclusory" then they "are not entitled to be assumed true," *Iqbal* at 1950. In promoting Fed. R. Civ. P 8 as the governance of all pleading standards in "in all civil actions and proceedings in the United states

district courts," *Iqbal* further states at 582 that "Rule 8 demands more than an unadorned, the defendant-unlawfully-harmed-me accusation" *Id.* 129 S.Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). This addresses McAllister as its response is just an attempt to continue the process and does not provide any supporting evidence on distinctiveness issues because such is impossible. More specifically, McAllister's simplistic recitation reminds one of what *Twombly* forbade: "a formulaic recitation of the elements of a cause of action will not do… Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*, at 1949. Indeed, Plaintiff's claims about its mark's distinctiveness begs the question with its response. *Twombly* stated the court is not required "to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (cited with approval in *Twombly*, 550 U.S. at 555).

### A. The Plaintiff's Mark Is Not Distinctive Given Insufficiency Of Facts Pled And Reasonable Inferences

In the McAllister Opposition memorandum, the Plaintiff proposes new precedent tests for secondary meaning but the Plaintiff does not offer any facts to meet the common criteria employed within courts which look to sales, advertising expenditures, consumer knowledge of the source, and other factors. The firm has no sales success to speak of. No ability of the consumer to link the mark to the source. No large advertising expenditures. The Plaintiff's only argument for distinctiveness is that the firm has existed for some years and is known (according to them) for "Excellence." By this calculation, the Plaintiff claims its surnames create a mark which must be more than just generic; therefore, it must be distinctive. But the promotion from generic to distinctive cannot based on claims of "excellence" and education. Secondary meaning is a high bar for the mark to be distinctive; this is a standard which the joined surnames McAllister Olivarius do not meet.

The primary significance test has been labeled the law of the land for determining protection of trademarks. *Genesee Brewing Co., v. Stroh Brewing Co.,* 124 F.3d 137, 143 (2d Cir. 1997). It is the most established test to establish a mark; it was adopted by the Supreme Court in *Kellogg Co., v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S. Ct. 109, 113, 83 LEd. 73 (1938) and thereafter codified by Congress in the Trademark Clarification Act of 1984, Pub.L., No. 98-620 § 102, 98 Stat. 3335 (codified at 15 U.S.C. § 1064). Under this common test, a plaintiff seeking to establish a valid trademark "must show that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Kellogg,* 305 U.S. at 118, 59 S.Ct. at 113. This primary significance test allows courts to divide trademarks into the five traditional and general categories originally created by Judge Friendly. To satisfy this requirement, a trademark need not only and exclusively indicate the producer ("the source") but may, instead, serve a "dual function-that of identifying a product while at the same time indicating its source," *A. J. Canfield v. Honickman*, 808 F.2d 291, 305-306 at 300 (quoting S.Rep. No. 98-627, 98th Cong.5 (1984)). Under this definition, we see that McAllister Olivarius fails to reach a standard above the generic. It is not possible to identify the product or source. Ebay (www.ebay.com) is the great American marketplace for products and producers. On Ebay today there are over 8,579 listings for "McAllister" which primarily include McAllister Shoes and Optical Antiques. There are no listings for "McAllister Olivarius" products. No books, photos, pamphlets, press clippings, treatises, handouts, or coffee mugs. On Amazon (www.amazon.com), there are over 10,000 listings for "McAllister," and many for intellectual property items, but zero for "McAllister Olivarius." Finally, on Google (www.google.com), the search for "McAllister" returns over 18 million entries; the first ten pages of returned results for "McAllister" do not show "McAllister Olivarius." There

are many McAllister shoes and quite a few McAllister attorneys in the Google results but "McAllister Olivarius" does not even make the first 10 pages, the initial return set to consumers. This is understandable, as according to the 2010 US Census (www.census.gov), there are over 173,000 firms in the United States that are listed under the SIC code for law practice. While many do important work, most labor while unknown to the public. MCO Law, nicknamed McAllister Olivarius, is one of those firms. To use the example upon which the Plaintiff based its claims in its response, *Genesee Brewing Co., v. Stroh Brewing Co.,* the name of McAllister Olivarius among all law firms, even if it can be identified as a law firm, is the same as "honey brown" was to the brewing concerns: it is generic and is not distinctive, carrying no secondary meaning.

It is the perception of the public which governs whether a mark is descriptive or not, the ideas of the plaintiff or defendant are not determinative. In the matter, *Lane Capital Mgmt. v. Lane Capital Mgmt.*, 192 F. 3d 337, 345 (2nd Cir. 1999) the court determined it is the public who decides what constitutes a mark.  As the review of the primary significance tests illustrates above, the public would not understand what McAllister Olivarius constitutes as the term of joined surnames is not descriptive or suggestive. Accordingly, it should not be afforded trademark protections. Without these protections, the Plaintiff's claim is unfounded.

The Plaintiff's claimed mark contains only personal names. Personal names used as trademarks could be protected only if they contain distinctive and secondary meaning. In *Bihari v. Gross* 119 F. Supp. 2d 309, 318 (S.D.N.Y. 2000) the court found that a personal name could be distinctive when linked to a suggestive term, in this case "Bihari Interiors." This term defined a commercial

relationship. No such term exists here however. It is not possible to know what type of business McAllister Olivarius is. It is not clear that it identifies a business at all.

At its core, the name of McAllister Olivarius is two joined surnames which do not suggest any form of business or consumer product. The relevant code 15 U.S.C. § 1125 (c)(2)(A) defines that a mark is famous when it is widely recognized by the general consuming public of the United States as a designation of a business or consumer product. The names McAllister and Olivarius are not famous or distinctive and, as shown, are completely unknown to most people in the United States. Accordingly, it does not merit the protections of 15 U.S.C.§1125(d) under which the Plaintiff makes a claim and Plaintiff has no cause for this action.

### B. The Defendant's Domain Name Is Not Identical Or Confusingly Similar Give Insufficiency Of Facts Pled And Reasonable Inferences

The second test of ACPA is for the domain names being identical or confusingly similar. The Plaintiff alleges that its mark of the joined surnames not its domain name is confusingly similar by citing a subsection of the ACPA entitled Cyberpiracy Prevention. This section of the ACPA is concerned with domain names containing marks. Under ACPA, the domain name in question must contain a distinctive mark in a domain name that is confusingly similar to the Plaintiff's mark. While Plaintiff does not do business as McAllister Olivarius, but instead as MCO law, Plaintiff believes its nickname McAllister Olivarius should be afforded the same protections as a distinctive mark. Defendant's domain name www.mcallisterolivariustruth.com is not confusingly similar to the www.mcolaw.com domain name. There is no domain name of www.mcallisterolivarius.com.

The claim that the names of the partners alone constitute a distinctive mark is not a reasonable inference, and therefore domain names with generic marks are not afforded protection.

"Name-suffix" websites are known in Internet parlance as a "complaint name" and the process of registering and using such names is known as cyber griping.[5] The "name-suffix" form would include those domain names which add the suffixes of "sucks" or "beware" or "truth" or "alert." In contrast to a same name griper, when the ACPA is applied to a "name-suffix" domain name, the courts have found that the "name-suffix" is not identical or confusingly similar. Rulings in *Lucent Techs., Inc. v. Lucentsucks.com* 95 F. Supp. 2d 528, 535 (E.D. Va. 2000) and other cases like *Bally Total Fitness Holding Corporation v. Andrew S. Faber* 29 F. Supp. 2d 1161 (C.D.Cal., Nov. 23,1998) have supported this understanding. In the matter of *Taubman Co. v. Webfeats*, 319 F. 3d 770,776 (6th Cir. 2003) the court's ruling was clear that holding a "name-suffix" complaint name removes any possibility of confusion under an infringement cause of action.

### C. The Defendant Did Not Act With Bad Faith Intent To Profit Given The Insufficiency Of Facts Pled And Reasonable Inferences

The Defendant did not act with bad faith to profit. In looking at the nine considerations, under which courts are to determine bad faith, the first three considerations involve the defendant's prior rights to the domain name due to trademark ownership, the defendant's legal name, or the defendant's sale of goods. In this case, Defendant did not sell goods or services on the domain name. The next two considerations involve the nature of the defendant's site, accounting for noncommercial or fair use of the name, and for defendant's intent to lure customers by confusing

---

[5] See page 4 of the Ruling from the Sixth Circuit Court of Appeals filed February 7, 2003 regarding *Taubman Co. v. Webfeats*, 319 F. 3d 770,776 (6th Cir. 2003).

the public. Defendant posted nothing of a commercial nature on the four webpages that were previously displayed. Defendant had a bona fide criticism of Plaintiff and wanted to show its mistreatment at the hands of the Plaintiff through Plaintiff's inflated and unethical billing practices.[6] Defendant did not attempt to lure customers nor offer legal services. There was nothing in the four dummy/filler/blank pages to lure or confuse customers if they happened upon the site. Defendant did not post advertising or links or anything of a commercial nature. The next three considerations involve the defendant's behavior, taking into account offers to sell the domain, defendant's use of a false name when registering the name, or the defendant's history of cybersquatting. In this matter, Defendant never attempted to sell the domain name to Plaintiff or to anyone else. Plaintiff did not state that Defendant ever offered to sell it in the Complaint because Defendant never offered. Defendant did not use a false name when registering. Defendant also never registered any other names with any connection to the names of mcolaw, mcallister, aoadvisors, olivarius, Rhodes project, or Ann Olivarius. The last ACPA consideration accounts for the strength of the trademark. As proven above, the names of McAllister and Olivarius are not distinctive or famous and do not merit trademark protection.

The Plaintiff makes an unmerited argument that Defendant profited by using the threat of the existence of the domain name in order to pay MCO law less that what it says it was owed. In reality the Defendant disputes that he owes MCO Law as much as they say he does. In order to buttress its false claim that the Defendant tried to extort the law firm, Plaintiff quoted a letter between the parties that was intended for settlement. Marked "FOR SETTLEMENT PURPOSES ONLY" this email exchange should rightly be excluded as evidence under Fed. R. Evid. 408. Plaintiff now

---

[6] See also *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F. 3d 806, 808 (6th Cir. 2004) in which criticism of plaintiff's hasty work was offered.

claims this was admissible because it speaks of another purpose. Defendant disagrees. Defendant never asked for money for the transfer or cessation of the website nor does Defendant imply there is a quid pro quo on settlement terms and the domain name. Even if the email was admissible, and it is not, and even if there was some quid pro quo which there was not, a defendant's offer to settle, as seen in the letter, has been upheld by courts as noncommercial. In the matter of *Bosley Med. Inst., Inc. v. Kremer*, No. 01-1752 WQH (JMA), 2004 U.S. Dist. LEXIS 8336 (S.D. Cal. Apr. 30, 2004) the defendant Kremer went so far as to offer a quid pro quo and his domain name was still ruled noncommercial. Similarly, in *Re Mayflower*, the court ruled that the defendant's demand for the company's action was related to defendant's desire for change on the company's part and not a demand for payout.[7] In the matter at hand, Defendant sought to warn others and to use the public record to force the Plaintiff to change its unethical practices, not for Defendant to seek a payout.

The site was noncommercial and it was intended to display ethical and professional histories so reasonable people could choose to hire MCO Law based on all the facts. There was no contact information on the four pages of dummy/filler/blank content so no one would have believed it was a commercial site as there was no ability to buy anything or contact anyone. No one contacted the Defendant through the website during the short time it was up. While Plaintiff argues that Defendant wanted to "cripple or close" MCO Law, but the four dummy/filler/blank pages had no commercial affect upon MCO Law.

---

[7] *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 369 (D.N.J. 2004).

## CONCLUSION

For the foregoing reasons, Defendant Mark Myers Mermel respectfully requests this Court grant

his motion to dismiss the Complaint in its entirety with prejudice. Defendant also asks for further

relief as this Court deems just, proper, or equitable including a further request that the court award

Defendant under Fed. R. Civ. P 11(c)(4) a reimbursement of legal fees which were spent to litigate

the precluded claim twice previously in Connecticut state court.

Dated: New York, New York
      March 8, 2018

By: _____

    M. Myers Mermel
    654 Madison Avenue
    Suite 1605
    New York, New York 10065
    212-943-7777 telephone
    *Acting in a Pro Se Capacity*

# EXHIBIT A

- Document ends on Page 18

# TABLE OF AUTHORITIES

Cases

*Arista Records LLC v. Lime Grp. LLC*, 532 F. Supp. 556, 566 (S.D.N.Y. 2007) .................. 7

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ...................... 7

*Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006) .......................................... 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ........ 7

*Bihari v. Gross*, 119 F. Supp. 2d 309, 317 n.11 (S.D.N.Y. 2000) .................................... 8

*BioCapital, LLC v. BioSystem Solutions, Inc.*, No. FSTCV085009331S, 2009 Conn. Super.
LEXIS 1502, at *10-11 (Conn. Super. Jun 1, 2009) .............................................. 5

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005)................................ 14

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039-40 (2d Cir. 1992)........ 9

*Centaur Comms. v. A/S/M Comms.*, 830 F.2d 1217, 1222 (2d Cir. 1987)) .............................. 9

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ................................... 7

*Coca-Cola v. Purdy*, 382 F.3d 774, 784 (8th Cir. 2004) .......................................... 12

*Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997) ....................... 7

*Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)............................................. 7

*Hamptons Locations, Inc. v. Rubens*, 640 F. Supp. 2d 208, 221 (E.D.N.Y. 2009) .................... 14

*Harrison v. Microfinancial, Inc.*, No. 03-11437-GAO, 2005 U.S. Dist. LEXIS 2804, at *11-13
(D. Mass. Feb. 24, 2005)....................................................................... 14

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ............................... 4

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012).............................. 4

*Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 473 (E.D.N.Y. 2009)................................... 13

*Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 344 n.2 (2d Cir. 1999)............ 8

*Lane Cap. Mgmt., Inc. v. Lane Cap. Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999)................. 9

*Lee v. Marvel Enters.*, 386 F. Supp. 2d 235, 245 (S.D.N.Y. 2005) ................................. 15

*Lefkowitz v. McGraw-Hill Global Educ. Holdings, LLC*, 23 F. Supp. 3d 344, 347 n.2 (S.D.N.Y.
2014)......................................................................................... 4

*Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004).................... 14

*Mattel, Inc. v. Adventure Apparel*, No. 00 Civ. 4085(RWS), 2001 U.S. Dist. LEXIS 13885, at *7
(S.D.N.Y. Sept. 7, 2001) (Sweet, J.) ......................................................... 12

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) ............................. 7

*Merritt v. Shuttle, Inc.*, 245 F.3d 182, 186 (2d Cir. 2001) ........................................ 2

*Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 586 (2d Cir. 2003) ................... 17

*Nat'l Cabinet & Millwork Installation, LLC v. Zepsa Indus.*, No. CV146048332S, 2014 Conn.
Super. LEXIS 3220, at *30-31 (Conn. Super. Dec. 31, 2014)...................................... 5

*New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) .......... 4

*Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996). .................... 2

*Omega S.A. v. Omega Eng'g*, 228 F. Supp. 2d 112, 127-29 (D. Conn. 2002) ........................... 12

iv

*Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003)..................................................... ~~7~~ 6

*People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 369 (4th Cir. 2001) ........ ~~14~~ 13

*PETA v. Doughney*, 263 F.3d at 366, 368................................................................. ~~17~~ 14

*PRL USA Holdings, Inc. v. United States Polo Ass'n*, 520 F.3d 109, 114 (2d Cir. 2008)........... ~~18~~ 16

*Sporty's Farm, LLC v. Sportsman's Market, Inc.*, 202 F.3d 489, 499 n.13 (2d Cir. 2000).......... ~~15~~ 13

*Storey v. Cello Holdings, LLC*, 347 F.3d 370, 385 (2d Cir. 2003) ................................ ~~15~~ 13

*Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (quoting *Birl v. Estelle*, 660 F.2d 592, 593 (5th
Cir. 1981)) ............................................................................................... ~~7~~ 6

*Trebor Sportswear Co. v. Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989)) ................. ~~18~~ 15

*Van Praagh v. Gratton*, 993 F. Supp. 2d 293 (E.D.N.Y. 2014) ................................... ~~12~~ 10

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 270 (4th Cir. 2001) ............... ~~19~~ 16

*We Media, Inc. v. Ge*, 218 F. Supp. 2d 463, 466 (S.D.N.Y. 2002)................................ ~~12~~ 10

*Web-adviso v. Trump*, 927 F. Supp. 2d 32, 41 (E.D.N.Y. 2013) ............................... ~~13~~, ~~14~~, ~~19~~, ~~20~~ 11, 12, 16, 17

*Yankee Publ'g Inc. v. News Am. Publ'g Inc.*, 809 F. Supp. 267, 276 (S.D.N.Y. 1992) .............. ~~20~~ 17

## Statutes

15 U.S.C. § 1121 ................................................................................ 2

15 U.S.C. § 1125(a) ............................................................................ 14

15 U.S.C. § 1125(d) ............................................................................ 14

15 U.S.C. § 1125(d)(1)(A) ..................................................................... 8, 11

15 U.S.C. § 1125(d)(1)(A)(ii) ................................................................. 11

15 U.S.C. § 1125(d)(1)(B) ..................................................................... 13

15 U.S.C. § 1125(d)(1)(B)(ii) ................................................................. 16

15 U.S.C. § 1127 ............................................................................... 8

28 U.S.C. § 1331 ............................................................................... 2

28 U.S.C. § 1441 ............................................................................... 2

28 U.S.C. § 1441(a) ........................................................................... 3

## Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................... 2

Fed. R. Civ. P. 12(b)(6) ...................................................................... ~~3~~ 4

Fed. R. Evid. 408(a) .......................................................................... ~~18~~ 15

Fed. R. Evid. 408(b)                                                                    15

# EXHIBIT B

DOCKET NO. NNH-CV-16-6062882-S        :        SUPERIOR COURT

MCALLISTER OLIVARIUS,                 :        J.D. OF NEW HAVEN

V.                                    :        NEW HAVEN

M. MYERS MERMEL.                      :        JULY 21, 2017


### PLAINTIFF'S REPLY TO DEFENDANT'S OBJECTION TO PLAINTIFF'S REQUEST FOR LEAVE TO FILE AMENDED COMPLAINT (ENTRY NO. 133.00)

Plaintiff submits this memorandum in reply to Defendant's Objection to Plaintiff's Request for Leave to File Amended Complaint filed on July 11, 2017 (the "Objection", entry no. 133.00).

**I.    Defendant Has Provided No Sound Reason For The Court to Deny Leave to Amend.**

This is the first time Plaintiff is seeking to amend its complaint. This case is still at the pleading stage, with Plaintiff's answer to Defendant's counterclaim not due until August 3, 2017. There has been limited written discovery and no depositions have been taken to date.

Courts in Connecticut employ a fairly permissive standard with respect to amended pleadings, and generally allow such amendments where there is no prejudice to the opposing party and the added causes of action reasonably relate to those in the initial complaint. "Although requests for leave to amend pursuant to [Practice Book] § 10-60 are subject to the court's discretion, our courts have been liberal in permitting amendments ... Courts traditionally deny leave to amend only if the amendment would prejudice the defendant by causing undue delay or the amendment does not relate back to the matters pleaded in the original complaint. *Gonzales v. Langdon,* 161 Conn. App. 497, 517–18, 128 A.3d 562 (2015) (reversing trial court's denial of a

request to amend as an abuse of discretion). *See also Jacobs v. Dometic Origo AB*, 916 A.2d 872, 875 (Conn. App. 2007) (in the interest of justice, courts are liberal in permitting amendments to complaints, and unless there is a sound reason, refusal to allow an amendment is an abuse of discretion); *Grigerik v. Sharpe*, 742 A.2d 434 (Conn. App. 2000) ("In exercising its discretion with reference to a motion for leave to amend, a court should ordinarily be guided by its determination of the question whether the greater injustice will be done to the mover by denying him his day in court on the subject matter of the proposed amendment, or to his adversary by granting the motion, with the resultant delay.")

Defendant asserts prejudice, but does not state with any specificity how he would be unfairly prejudiced by the proposed amendment. He contends that the amendment should not be allowed because it raises "deeply complicated factual issues" necessitating additional discovery and delay of the trial. Objection, at 5. Defendant asserts with absolutely no specifics that "the new claim will most definitely involve different evidence, discovery, and witnesses than the original claim." Objection at 6. Defendant fails to identify even one additional witness that will need to be deposed as a result of the new claim.

In reality, Defendant will not need to conduct substantial, if any, additional discovery because the facts regarding the new claim are in his possession and within his knowledge. It is his website. Further, there is no reason for the trial date to be continued because of the additional claim.

Defendant further argues that the new claim "is completely unrelated to the original claim." Objection at 3. On the contrary, the relationship is clear and direct. Absent the breach of contract there would not have been a lawsuit, and absent the lawsuit, Defendant would not have created his disparaging and misleading website. If Plaintiff had instead waited and brought a

separate lawsuit alleging cybersquatting, Defendant presumably would have argued the second case constitutes a waste of judicial resources and should be precluded under the doctrine of *res judicata.*

Defendant also asks the Court to rule on the merits on the new claim, which of course is squarely at odds with his position that there are a multitude of factual issues raised by the new claim. The court need not and should not rule on the merits of the new claim at this point, especially since Defendant has not made a plausible argument of prejudice. "[S]ubstantive issues generally are not well suited to determination in the context of an objection to a request to amend … ." *Figueroa-Nazario v. Montague*, 63 Conn. L. Rptr. 741 at *1 (Conn. Superior Court, January 17, 2017).

Regarding the merits, the case of *Bihari v. Gross*, 119 F. Supp, 2d 309 (S.D.N.Y. 2000), cited by Defendant at page 7 of his Opposition, is readily distinguishable. In *Bihari*, a provider of home design services, Bihari Interiors, brought a trademark infringement action and defamation suit against the operator of a website, Gross, who was critical of Bihari and her interior design services. *Id.* at 311-12. Gross's website was similar to the Defendant's website in the present case in that Gross's website provided disparaging information concerning Plaintiff. The court was convinced that there was no reasonable likelihood of confusion between guest book entries and defamatory titles. *Id.* at 314-15. All of the Gross websites used the "Bihari Interiors" mark as text and as metatags embedded within the websites' HTML code. *Id.* at 313.  [N]o reasonable viewer would believe that the disparaging comments regarding Bihari's business ethics … are endorsed by Bihari." *Id.* at 319. Furthermore, the court found it relevant that there was no "lengthy delay between attempting to access plaintiff's home page and learning that one had failed to do so." *Id.*

3

In sharp contrast, Defendant designed and created his website for the purpose of confusing the public that it was in fact the website of Plaintiff. The goal was confusion, and to show Plaintiff in an incompetent light, not the creation of a forum to critique and criticize Plaintiff and its legal services.

Defendant also asserts that "it is difficult to determine exactly what McAllister Olivarius is, or what type of company/service it is identifying. Objection, at 8. A quick Google search identifies the name as a law firm. Plaintiff submits that there is unlikely to be any other person or entity with that name. Neither the first name nor the last name are common, and when you put the two together you have an even less common name. Plaintiff concedes, however, that this is a factual question.

Defendant also claims that Plaintiff's name is not famous. Plaintiff has in fact a robust reputation in legal circles. But regardless, the protections under 15 U.S.C. § 1125 are not only available to famous people. They are available to all persons who have a distinctive mark or a famous mark. *Id.* at § 1125(d)(1)(A)(ii).

To sum, Defendant fails to articulate any unfair prejudice or other cogent reason why the request for leave to amend to add the claim for cybersquatting should be denied.

## II.    The Court Should Further Allow Plaintiff to Add a Claim for Intentional Spoliation of Evidence Given Defendant's Admission that His Website No Longer Exists.

Connecticut is one of a few states that recognizes the tort of intentional spoliation of evidence. In *Rizzuto v. Davidson Ladders Inc.*, 280 Conn. 225, 234-35 (2006), the Connecticut Supreme Court determined that such a cause of action is necessary to compensate the victims of spoliation and to deter future spoliation. The Court recognized what is self-evident -- "the

4

intentional destruction of evidence should be condemned. Destroying evidence can destroy fairness and justice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action. Destroying evidence can also increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence, which may be less accessible, less persuasive, or both." *Id.* (quoting *Cedars–Sinai Medical Center v. Superior Court,* 18 Cal.4th 1, 8, 954 P.2d 511, 74 Cal.Rptr.2d 248 (1998)).

The cause of action for intentional spoliation lies where a defendant "destroys evidence intentionally with the purpose and effect of precluding a plaintiff from fulfilling his burden of production in a pending or impending case." *Rizzuto,* at 234.

Defendant admits that the website it created for the purpose of injuring Plaintiff's reputation and bullying Plaintiff into dropping the lawsuit "as of today does not exist." Objection, at 1. According to Defendant, the fact that he has eliminated evidence of the website's existence and content is a reason for the Court to deny the motion to amend. The cybersquatting claim is a "non-issue" because the website "does not exist." *Id.* It isn't quite as simple as Defendant suggests. One cannot get rid of a claim by getting rid of the evidence that supports the claim.

Of course, Plaintiff was injured by the website and is not objecting per se to the fact that the content is no longer available for viewing by the general public. Preventing access to a website, however, is very different than destroying its existence and its content. Defendant did not confer with Plaintiff prior to making the decision to make the website "non-existent." Clearly such consultation was in order given the ongoing litigation. If the parties could not reach agreement on the proper process and procedure, the issue should have been addressed by the Court prior to Defendant taking decisive, unilateral action.

5

Defendant further states that the website "did not have any substantial content" and then says that "a website with no content cannot be profited from." Which is it? Did it have no content or did it have no "substantial" content, however Defendant chooses to define that term? The Plaintiff and the jury should not have to take Defendant at his word when he says the content was insubstantial or non-existent. The jury is entitled to see the content, not just hear Defendant's self-serving description of "no content."

We know of course that the website *did* have some content. Screenshots from the website are attached to the Proposed First Amended Complaint. Plaintiff may never know for certain, however, what content was on the website and when and for how long, as well as viewer analytics. Because of Defendant's actions, Plaintiff is less able to meet its burden of proof on the cybersquatting claim, and will have increased difficulty proving the damages resulting from that violation.

For these reasons, Plaintiff will seek leave to further amend its operative pleading to include the spoliation of evidence cause of action, which is Count Four of the Proposed Second Amended Complaint attached to this reply memorandum.

DATED:  July 21, 2017

Respectfully submitted,

PLAINTIFF MCALLISTER OLIVARIUS

BY:     s/Rowena A. Moffett
   Rowena A. Moffett, Esq.
   Brenner, Saltzman & Wallman LLP
   271 Whitney Avenue
   New Haven, CT 06511
   Juris No. 006063
   Tel. (203) 772-2600
   Fax. (203) 562-2098
   Email: rmoffett@bswlaw.com

     and

   John F. McAllister
   Connecticut Bar No.: 308212
   McAllister Olivarius
   5 Wells Street
   Saratoga Springs, New York 12866
   Telephone: (518) 633-4775
   Facsimile:  (781) 658-2480
   Its Attorneys

7

DOCKET NO. NNH-CV-16-6062882-S           :        SUPERIOR COURT

MCALLISTER OLIVARIUS,                    :        J.D. OF NEW HAVEN

V.                                       :        NEW HAVEN

M. MYERS MERMEL.                         :        JULY 21, 2017

## SECOND AMENDED COMPLAINT

Plaintiff, McAllister Olivarius ("Plaintiff" or "McAllister Olivarius"), brings this action against Defendant M. Myers Mermel ("Defendant") and in support states as follows:

## PARTIES

1.      Plaintiff, McAllister Olivarius, is a general partnership that operates in the United Kingdom and the United States.  McAllister Olivarius maintains offices in Maidenhead, England and Saratoga Springs, New York.  McAllister Olivarius represents clients in multiple locations, including Connecticut, where one of its managing partners is licensed to practice law.

2.      Defendant is an experienced businessman, real estate developer and former candidate for Lieutenant Governor of New York who, upon information and belief, is a citizen of the State of New York and regularly travels to the State of Connecticut for his education.

## JURISDICTION AND VENUE

3.      This action arises under Connecticut state law governing breach of contract and the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).  This court has jurisdiction over the Anti-Cybersquatting Consumer Protection Act claim pursuant to 15 U.S.C. § 1121.

4.      This Court has personal jurisdiction over Defendant by virtue of, among other things, the forum selection clause in the Engagement Letter, as well as Defendant's contacts with Connecticut that gave rise to the Connecticut Dispute, discussed below, for which McAllister Olivarius represented Defendant, and Conn. Gen. Stat. § 52-59b(a).

DS023301

5.     Venue in this Court is proper pursuant to the forum selection clause of the Engagement Letter set forth below.

## FACTUAL ALLEGATIONS

### *Legal Representation Agreement Between McAllister Olivarius and Defendant*

6.     On or about May 15, 2012, Defendant retained the representation of McAllister Olivarius as legal counsel for a legal dispute that Defendant had become entangled with in New Haven County, Connecticut (the "Connecticut Dispute"). At the time that Defendant retained McAllister Olivarius, formal proceedings had not been instituted in the matter and all discussions and interactions among involved parties were occurring outside of court.

7.     The terms of McAllister Olivarius's representation of Defendant in the Connecticut Dispute were memorialized in a written engagement letter, signed by Defendant on May 15, 2012 (the "Engagement Letter"), attached hereto as Exhibit A[1].

8.     Under the terms of the Engagement Letter, McAllister Olivarius agreed to provide legal services, and Defendant agreed to pay for those services.

9.     The Engagement Letter provided that Jef McAllister, a Connecticut and New York licensed attorney, would be the partner responsible for the legal representation of Defendant.

10.     By reference to an attached rate card, the Engagement Letter specified the hourly billing rates that Defendant would be charged for work performed by lawyers and other professional staff.

---

[1] The Engagement Letter has been redacted to exclude all information relating to the representation, to protect Defendant's confidences to the extent possible.

11.    The Engagement Letter also provided that in addition to hourly fees, Defendant would be responsible for any costs incurred on his behalf during the representation.

12.    The Engagement Letter expressly incorporated by reference the terms and conditions set forth in McAllister Olivarius's Terms of Business (the "Terms of Business"), a copy of which was signed by Defendant on the same date.

13.    The Terms of Business provided, in part:

> 2. Fees and expenses will be invoiced monthly or as agreed and payment is due upon receipt.  If you make no comment about the statement within 15 days of its date, we will assume that you have reviewed it and find it acceptable.  Interest at a rate of 15% per annum, compounded monthly, will be charged on all outstanding invoice amounts which are not paid within 30 days of the invoice date. Such interest will accrue from the due date of the invoice on (i) the fees as billed without taking into account any discount given to you, (ii) expenses, and (iii) any other outstanding amounts. Should the invoice remain outstanding for more than 45 days any discounts provided in the invoice and under the terms of the engagement letter will be removed and you will be charged at our undiscounted standard rates prevailing at the time of your engagement as set forth in your engagement letter.

> 3.  If you fail to pay any amount owing to the firm, you agree to be responsible for all collection expenses incurred by the firm, including costs and reasonable outside lawyers' fees, and our time at our prevailing rates without discount, whether or not litigation is commenced.

(emphasis in original)

14.    The Terms of Business also specified the venue for resolution of any disputes relating to the Engagement Letter or Terms of Business, providing:

**G. Controlling Law**

Any dispute or legal issue arising from these terms of business or the engagement letter will be determined by the laws of the State of Connecticut, without reference to the principles of conflicts of laws, and

considered    exclusively    by    Connecticut    and    US    courts.

### *McAllister Olivarius's Provision of Legal Services to Defendant*

15.    Pursuant to the Engagement Letter, McAllister Olivarius rendered legal services and incurred costs with respect to the Connecticut Dispute.

16.    Throughout the course of the representation, McAllister Olivarius worked diligently and vigorously in its representation of Defendant. Defendant, on more than one occasion during the representation, expressed his pleasure with the work performed by McAllister Olivarius.[2] A year after the main body of work on the Connecticut Dispute was completed, Defendant re-engaged McAllister Olivarius to perform further legal work in England.

### *Defendant's Failure to Make Agreed Upon Payments for Legal Services*

17.    Between May of 2012 and August of 2014, McAllister Olivarius sent eight invoices to Defendant, dated May 31, 2012, July 11, 2012, August 10, 2012, February 20, 2013, April 3, 2013, May 13, 2013, July 10, 2013, and August 14, 2014. Each invoice set forth the fees owed for the relevant period and detailed the time spent and work performed by McAllister Olivarius.

18.    Defendant paid only one invoice, dated May 31, 2012, on time and in full.

19.    In August of 2012, Defendant's retainer was applied with his agreement to pay a portion of the July 11, 2012 invoice.

20.    After his payment on the May 31, 2012 invoice, Defendant did not make another payment until January 8, 2014, a gap of approximately 18 months.

---

[2] Because the Connecticut Dispute is not public record, the details of the representation are not included herein in an effort to protect Defendant's confidences to the extent possible.

21.    After the January 8, 2014 payment, Defendant did not make another payment until April 15, 2015.  The payment he made on this date was a very small percentage of the outstanding balance due on that date.

22.    Defendant has not made any payments since April 15, 2015.

23.    On multiple occasions during his engagement, Defendant affirmatively assured McAllister Olivarius that he would pay his outstanding balance. Due to these assurances, its professional obligations, and a concern for protecting Defendant's legal interests, McAllister Olivarius continued to zealously represent Defendant in the Connecticut Dispute despite his failure to make timely payments.

24.    McAllister Olivarius made multiple attempts to obtain payment from Defendant, even offering Defendant discounts if he would make prompt payment on his outstanding balance.

25.    As of the date of this Amended Complaint, Defendant's current outstanding balance owed to McAllister Olivarius for services rendered plus costs is $399,758.66, inclusive of interest due pursuant to the Engagement Letter.

### *Defendant's Response to McAllister Olivarius's Efforts to Collect Unpaid Sums*

26.    In response to McAllister Olivarius's efforts to collect the unpaid sums owed by the Defendant, Defendant has undertaken a pattern of conduct to harass and intimidate McAllister Olivarius into dismissing this collection action.

27.    As part of this pattern of conduct, on or about July 1, 2016, Defendant registered the domain name mcallisterolivariustruth.com. Defendant created a website at the domain name.  The website contains stock photos of individuals unrelated to the McAllister Olivarius law firm. The website contains sections for "Attorneys," "Practice

Areas," and "Contact Us." As of the date of this filing, the homepage for the website contains the words, "HI, MR. JEF!," referring to the Managing Partner at the McAllister Olivarius law firm. A screenshot of the website at the domain name mcallisterolivariustruth.com is attached to this Amended Complaint as Exhibit B.

28. The website created by Defendant at the domain name mcallisterolivarustruth.com does not contain any accurate information regarding the McAllister Olivarius law firm.

29. Defendant is unlawfully using the domain name and website as leverage in this collection dispute. On or about July 1, 2016, Defendant informed Jef McAllister that he would publish information on the mcallisterolivariustruth.com website regarding complaints against one of the attorneys at McAllister Olivarius, if McAllister Olivarius does not accept his demands to settle the collection dispute. Defendant is using the website and domain name in an attempt to avoid paying the money he owes to McAllister Olivarius.

## FIRST CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

30. McAllister Olivarius hereby incorporates by reference each and every allegation set forth above as if set forth fully herein.

31. The Engagement Letter is a valid and enforceable contract between McAllister Olivarius and Defendant.

32. McAllister Olivarius has duly performed or satisfied all conditions, promises and obligations required to be performed or satisfied by it in accordance with the terms and conditions of the Engagement Letter.

33.     Defendant has materially and repeatedly breached his obligations under the Engagement Letter by failing to pay McAllister Olivarius for agreed upon legal fees and costs and by failing to pay interest on the unpaid amounts as agreed.

34.     As a direct and proximate result of Defendant's breach of the Engagement Letter, McAllister Olivarius has suffered damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

## (QUANTUM MERUIT)

35.     McAllister Olivarius hereby incorporates by reference each and every allegation set forth above as if set forth fully herein.

36.     McAllister Olivarius has performed legal services and incurred costs at Defendant's request.

37.     Defendant promised to pay McAllister Olivarius for the reasonable value of the legal services to be performed and the costs to be incurred at his request.

38.     McAllister Olivarius has requested payment from Defendant for the reasonable value of the services McAllister Olivarius has performed and the reasonable value of costs it has incurred. Defendant has and continues to refuse to pay McAllister Olivarius for the services rendered and costs incurred.

39.     Despite repeated requests to do so, Defendant has failed to complete payment to McAllister Olivarius for legal services it has performed and costs it has advanced, thereby breaching the Engagement Letter.

40.     As a direct and proximate result of Defendant's breach of the Engagement Letter, McAllister Olivarius has suffered damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

## (VIOLATION OF THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT)

41.    McAllister Olivarius hereby incorporates by reference each and every allegation set forth above as if set forth fully herein.

42.    McAllister Olivarius has a trademark in its firm name McAllister Olivarius. The McAllister Olivarius trademark is protected as a mark under 15 U.S.C. § 1125.

43.    The McAllister Olivarius mark is distinctive.

44.    McAllister Olivarius has used and did use the mark continuously from 1996 through the present.

45.    Defendant registered the domain name mcallisterolivariustruth.com on or about July 1, 2016.   The domain name registered and used by Defendant at mcallisterolivariustruth.com is confusingly similar to the McAllister Olivarius mark.

46.    Defendant does not have any bona fide business use for the mcallisterolivariustruth.com website or domain name.

47.    Defendant does not have any bona fide noncommercial use for the mcallisterolivariustruth.com website or domain name.

48.    Defendant had and continues to have a bad faith intent to profit from his use of the McAllister Olivarius mark.

## FOURTH CLAIM FOR RELIEF

## (INTENTIONAL SPOLIATION OF EVIDENCE)

49.    McAllister Olivarius hereby incorporates by reference each and every allegation set forth above as if set forth fully herein.

50.    Defendant had a legal duty to preserve evidence relevant and material to the claims at issue in this case.

8

51.     In direct contravention of this duty, Defendant intentionally removed and deleted the mcallisterolivariustruth.com website and domain name, after Plaintiff filed its Request for Leave to File Amended Complaint on June 27, 2017, and prior to Defendant's filing of his Objection to Plaintiff's Request for Leave to File Amended Complaint. According to that filing, the website "today does not exist ..." The destruction of the evidence was purposeful and not inadvertent.

52.     The website existed at the time Plaintiff filed its Motion to Amend, and was deleted and removed in response to Plaintiff's proposed amended complaint.

53.     Defendant acted in bad faith with the intent and for the purpose of destroying evidence that would have proved unfavorable to his legal position at trial.

54.     As a result of Defendant's bad faith, evidence necessary to prove Plaintiff's claims may have been lost forever and cannot be recreated.

55.     Plaintiff is entitled to recover damages to compensate it for the destruction of the evidence and the potential loss of one or more claims in the case, and may also be entitled to recover attorney fees and punitive damages as a result of defendant's dilatory, bad faith, and harassing litigation conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, McAllister Olivarius prays for judgment against Defendant as follows:

1.     Money damages owed under the terms of the Engagement Letter including the unpaid monthly invoices for time and costs;

2.     Pre-judgment and post-judgment interest as provided in the Engagement Letter and/or allowed by law;

3.     The costs and reasonable attorneys' fees incurred by McAllister Olivarius in pursuing this action, as provided in the Engagement Letter;

4.     Statutory damages, or money damages sustained by the plaintiff, for Defendant's violation of 15 U.S.C. § 1125(d), pursuant to 15 U.S.C. § 1117(a) and (d);

5.     Injunctive relief to enjoin Defendant from any further and/or continuing violation of 15 U.S.C. § 1125(d);

6.     The costs and reasonable attorneys' fees incurred by McAllister Olivarius in pursuing this action, pursuant to 15 U.S.C. § 1117(a);

7.     Compensatory damages, punitive damages, and attorneys' fees for the tort of intentional spoliation of evidence; and

8.     For such other relief, at law or in equity, as this Court may deem just and proper.

DATED:  July 21, 2017

Respectfully submitted,

MCALLISTER OLIVARIUS

BY:    s/Rowena A. Moffett

Rowena A. Moffett, Esq.
Brenner, Saltzman & Wallman LLP
271 Whitney Avenue
New Haven, CT 06511
Juris No. 006063
Tel. (203) 772-2600
Fax. (203) 562-2098
Email: rmoffett@bswlaw.com

and

John F. McAllister
Connecticut Bar No.: 308212
McAllister Olivarius
5 Wells Street
Saratoga Springs, New York 12866
Telephone: (518) 633-4775
Facsimile:  (781) 658-2480

Its Attorneys

# EXHIBIT A



*Sent via E-mail*

May 14, 2012

M. Myers Mermel

██████████@gmail.com

**Engagement Letter**

Dear Myers:

**Thank you for instructing us to act on your behalf in relation to** ████████████
██████████████    This letter, plus our general Terms of Business which are also
enclosed, set out the terms of our engagement.  Please read them both, and if you have any
questions, get in touch with us.  If you agree to the terms set out, please sign both
documents and return them to us.

**Scope of work and your objectives**



1.

2.

3.

4.

█████████████████████████████████████████████████
**518-633-████**

PRIVATE & CONFIDENTIAL

**5.**



' Fées ''

<u>Hourly</u>

**6.**    We attach our standard rate card, setting out our present billing rates for lawyers and other professional staff, which range from $120 to $850 per hour. These billing rates are reviewed periodically and we will give you reasonable notice in writing of any change. We are pleased to offer you a discounted rate of $500 per hour for hours billed by Partners.

**7.**    We propose to bill you on the basis of time recorded, so that the invoiced fees will be the product of hours worked multiplied by the relevant hourly rate. We reserve the right to renegotiate our fees should services beyond those contemplated by this engagement be required.

**8.**    We will require a retainer of $5,000, payable upon the execution of this engagement letter. The funds should be wired to the following account:

BALLSTON SPA NATIONAL BANK

Account No: ███████████

Routing No: 021304675

Account Name: McAllister Olivarius

We may draw upon this retainer at any time to satisfy any outstanding invoices related to this matter. Should these funds be depleted below $1,000, we will require the retainer be fully replenished to $5,000.

<u>Costs</u>

**9.**    You will be responsible for the costs of any expense incurred by us on your behalf, including without limitation travel expenses, business meals, telephone and printing costs and online legal research. In our invoice these will be itemized separately from our fees. You will also be responsible for meeting the costs and expenses of any external experts, consultants and counsel engaged on your behalf. Before any such engagement we will explain the potential benefits and costs involved, and will only proceed with your consent. All invoices from outside counsel and/or experts/consultants will be forwarded

PRIVATE & CONFIDENTIAL

to you directly when received, and it will be your independent responsibility to see that these are paid in a timely fashion. We do not anticipate the need for any external experts, consultants, or counsel at this time. We will provide notice and obtain approval of any expenses or travel in excess of $1,500.

### Personnel

10.   I am the partner responsible for this matter and will co-ordinate the work and the advice given to you. I am licensed to practice law in the States of Connecticut and New York.

11.   Rosie Wu, a legal assistant, is assigned as the point person for the matter, and is available to you as a resource and point of first contact within the firm. We reserve the right to alter the personnel assigned to your matter in order to provide the best possible representation.

### Liability

12.   Our services are provided to you solely and exclusively by McAllister Olivarius, a general partnership. You agree that each of our partners, employees and consultants: (a) does not assume any personal responsibility to you or any other person; (b) does not owe you or any other person any personal duty of care; and (c) shall not be liable to you or any other person for any loss, liability, cost or expense arising, directly or indirectly, as a consequence of their own acts or omissions. This shall not exclude or limit the liability of any of our partners, employees or consultants to you to the extent that applicable law does not permit such exclusion or limitation.

13.   You agree that McAllister Olivarius will not be liable for any consequential, special, indirect or exemplary damages, costs or losses or any damages, costs or losses attributable to lost profits or opportunities.

### Termination of Representation

14.   Either of us may terminate this engagement at any time for any reason by written notice. We are subject to applicable rules of professional conduct when terminating a client engagement. If we terminate the engagement, we will take all reasonable and practical steps to protect your interests in relation to this matter and if you request, suggest possible new counsel. We will provide new counsel with any papers you have given us. Unless previously terminated, this engagement will end when we agree satisfactory resolution of the matter is achieved.

### Complaints

15.   McAllister Olivarius is committed to high quality legal advice and client care. If you are unhappy about any aspect of the service you have received, please contact me on +44 (0) 20 7386 1055 or jmcallister@mcolaw.com or by mail to our London office. We have a written complaints policy which is available to you on request.

PRIVATE & CONFIDENTIAL

Should you have any queries about this letter or the terms of business, please feel free to contact me or Rosie Wu on +44 (0) 20 3080 3907 or rwu@mcolaw.com.

Very truly yours,

Dr. JFO McAllister
Managing Partner

_____

I have read, understood and accept the foregoing terms and conditions for legal representation, as well as McAllister Olivarius' Terms of Business:

Signature: _____    Date: _____
            M. Myers Mermel

McAllister Olivarius
RE: Legal Representation – M. Myers Mermel
14 May 2012 - 189507
Page 4 of 4

MᴄAʟʟɪsᴛᴇʀ
Oʟɪᴠᴀʀɪᴜs

**Privileged and Confidential**

**McALLISTER OLIVARIUS**

**TERMS OF BUSINESS**
**GENERAL PROVISIONS**

Except as modified by the accompanying engagement letter, the following terms and conditions apply to the relationship between McAllister Olivarius and our clients. References in these Terms of Business to "we," "our," "us" and "the firm" should be interpreted as references to McAllister Olivarius; references to "you" and "your" refers to the client or the client's:

**A.    Fees and Expenses**

1.    Fees and expenses will be charged as set forth in the engagement letter.

**B.    Billing and liability for payment of invoices**

2.    Fees and expenses will be invoiced monthly or as agreed and payment is due upon receipt. If you make no comment about the statement within 15 days of its date, we will assume that you have reviewed it and find it acceptable. Interest at a rate of 15% per annum, compounded monthly, will be charged on all outstanding invoice amounts which are not paid within 30 days of the invoice date. Such interest will accrue from the due date of the invoice on (i) the fees as billed without taking into account any discount given to you, (ii) expenses, and (iii) any other outstanding amounts. Should the invoice remain outstanding for more than 45 days any discounts provided in the invoice and under the terms of the engagement letter will be removed and you will be charged at our undiscounted standard rates prevailing at the time of your engagement as set forth in your engagement letter.

3.    If you fail to pay any amount owing to the firm, you agree to be responsible for all collection expenses incurred by the firm, including costs and reasonable outside lawyers' fees, and our time at our prevailing rates without discount, whether or not litigation is commenced.

**C.    Our right to withdraw services and your duties**

4.    We are entitled to stop our work and withdraw our services for any of the following reasons: (a) you fail to pay any of our invoices when due; (b) you withhold material information from us or make material misrepresentations to us, where the representation or omission relates to facts which might reasonably affect the substance of our advice or our ability to serve your interests generally; or (c) you fail to cooperate with us or to follow our advice, in such a way that we consider that our ability to serve your interests is compromised. If we elect to withdraw our representation for any of these reasons, we will give you reasonable notice and you will take all steps necessary to free us of any obligation to perform further services, including the execution of any documents necessary to complete our withdrawal, and we will be entitled to be paid for all services rendered and costs and expenses paid or incurred on your behalf up to and including the date of withdrawal.

Privileged and Confidential

5.   You agree that McAllister Olivarius, its partners, employees and agents will not be liable for any consequential, special, indirect or exemplary damages, costs or losses or any damages, costs or losses attributable to lost profits or opportunities.

### D.   Your termination of our services

6.   You may terminate our services and representation by notice to us in writing. Such termination does not, however, relieve you of the obligation to pay for all services rendered and expenses paid or incurred on your behalf from the date of commencement to the date of termination.

### E.   Termination of lawyer-client relationship upon completion of services

7.   It is our policy that the attorney-client relationship is terminated upon completion of any services that we have been retained to perform. If you later retain us to perform further or additional services, our attorney-client relationship will be revived subject to these terms of business, as they may be supplemented or changed at that time. When our services are complete, we will send you a disengagement letter, summary of fees and return any documents furnished by you to us as required by controlling law as stated below.

### F.   Regulation

9.   McAllister Olivarius is a multi-jurisdictional partnership. Partner Dr. Ann Olivarius is a licensed attorney of Virginia, the District of Columbia, New Hampshire, Minnesota, and a registered solicitor in England and Wales. Partner Dr. JFO McAllister is a licensed attorney in New York and Connecticut and a registered foreign lawyer in England and Wales.

### G.   Controlling Law

10.   Any dispute or legal issue arising from these terms of business or the engagement letter will be determined by the laws of the State of Connecticut, without reference to the principles of conflicts of law, and considered exclusively by Connecticut and US courts.

I have read, understood and accept the foregoing terms and conditions for legal representation, as well as the terms set out in the engagement letter with McAllister Olivarius.

Signature:   _~M-Olyn--Vh---f_   Date:   _May 15 2012_

M. Myers Mermel

McALLISTER
OLIVARIUS

## STANDARD RATE CARD – 2012

| Fee Earner | US |
|---|---|
| Senior Partner | $ 850.00 |
| Senior Counsel | $ 660.00 |
| Associate | $ 400.00 |
| Legal Advisor | $ 320.00 |
| Senior Legal Analyst | $ 200.00 |
| Legal Analyst | $ 120.00 |

# EXHIBIT B

# McAllister Olivarius TRUTH

HOME

## HI, MR JEF!

FIND OUT MORE NOW





OVERWHELMED? WE CAN HELP >

LEARN ABOUT OUR SERVICES >

WebsiteBuilder

# McAllister Olivarias TRUTH

ATTORNEYS

## WE'LL HELP YOU FIND YOUR WAY









WebsiteBuilder



PRACTICE AREAS

# McAllister Olivarius TRUTH

CONTACT

## WHERE DO I GO?

### SEND A MESSAGE!

OUR LOCATION

Name

Email

☐

Subject

Message

SUBMIT

WebsiteBuilder

## CERTIFICATION

I hereby certify that a true and accurate copy of the foregoing was transmitted this 21st of July, 2017, electronically to the New Haven Superior Court Clerk.

I further certify that a copy of the foregoing was also mailed or delivered electronically or non-electronically, this 21st day of July, 2017 to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties receiving electronic delivery:

Sandra R. Stanfield, Esq.
Stanger & Associates LLC
433 South Main Street
Suite 112
West Hartford, CT 06110
sstanfield@stangerlaw.com


John F. McAllister, Esq.
McAllister Olivarius
5 Wells Street
Saratoga Springs, NY 12866
JMcAllister@mcolaw.com


*s/Rowena A. Moffett*
Rowena A. Moffett

8