UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
MCALLISTER OLIVARIUS,                       :
                                            :
                                            :    17 Civ. 9941 (JSR)
        Plaintiff,                          :
                                            :    OPINION AND ORDER
        -v-                                 :
                                            :
MARK MYERS MERMEL,                          

        Defendant.

------------------------------------------

JED S. RAKOFF, U.S.D.J.

This case is the unfortunate devolution of a dispute between

the McAllister Olivarius law firm and its former client Mark Myers

Mermel regarding legal fees. In its single-count Complaint,

plaintiff McAllister Olivarius alleges that defendant Mermel

registered the domain name mcallisterolivariustruth.com in order to

divert potential clients and others seeking information about the

firm and, having done so, to induce plaintiff to reduce the amount

it was seeking from him in unpaid legal fees by threatening to

publish allegedly damaging documents about plaintiff on the website.

Defendant thereby, in plaintiff's view, violated the

Anticybersquatting Consumer Protection Act. Before the Court is

defendant's motion to dismiss for lack of jurisdiction under Federal

Rule of Civil Procedure 12(b)(1) and for failure to state a claim

under Federal Rule of Civil Procedure 12(b)(6). ECF No. 8.

## BACKGROUND

The pertinent allegations of the Complaint are as follows:

Plaintiff is a general partnership that operates as a law firm both in the United Kingdom and the United States. Complaint ("Compl.") at p.1 ¶ 1, ECF No. 1. Dr. Ann Olivarius, together with Dr. Jef McAllister, founded McAllister Olivarius in 1996 as a general practice law firm. See id. at p.2 ¶ 1. The firm specializes in cases involving gender discrimination and sexual harassment in employment and educational settings. Id.

Since its founding, plaintiff has regularly, continuously, and systematically used the name "McAllister Olivarius" in connection with the marketing and promotion of its legal services throughout the United States and abroad. See id. at p.4 ¶ 6. Among other things, McAllister Olivarius promotes itself through articles about its cases published in media outlets and online via its website and social media presence. Id. The firm's cases also have generated articles in multiple publications, including the New York Times, the Los Angeles Times, Huffington Post, and the Chronicle of Higher Education. Id. Plaintiff's website, mcolaw.com, has attracted more than 78,000 visitors worldwide since January 1, 2014. Over 800,000 people have viewed information distributed by Olivarius via Twitter in October and November 2017. Id.

Defendant Mark Myers Mermel is a real estate developer and a former candidate for Lieutenant Governor of New York. Id. at p.2 ¶ 2. Mermel has earned postsecondary degrees from the University of Vermont, Columbia University, and the Divinity School at Yale

2

University. Id. at p.2 ¶ 2. Mermel retained plaintiff as counsel on or about May 15, 2012 in connection with a dispute with Yale. Id. at p.5 ¶ 8. The terms of plaintiff's representation in connection with this dispute were memorialized in a written engagement letter, which was signed by Mermel on May 15, 2012 (the "Engagement Letter"). Id. at p.5 ¶ 9; see also id. at Ex. A. The Engagement Letter contains a provision that "[a]ny dispute or legal issue arising from these terms of business or the engagement letter will be determined by the laws of the State of Connecticut, without reference to the principles of conflicts of law, and considered exclusively by Connecticut and US courts." Id. at Ex. A, Terms of Business ¶ 10.

Between May 2012 and August 2014, plaintiff sent eight invoices to Mermel, each setting forth the fees owed for its legal representation of Mermel and detailing the time spent and work performed. Id. at p.6 ¶ 12. Defendant refused, and continues to refuse, to pay plaintiff as required by the terms of the Engagement Letter. Id. at p.6 ¶ 11. Accordingly, on June 20, 2016, plaintiff filed a civil action against defendant for breach of contract and quantum meruit in the Superior Court for New Haven County, Connecticut. Id. at p.6 ¶ 13.

At some point, Mermel registered the domain name mcallisterolivariustruth.com. Id. at p.6 ¶¶ 14-15. The website bore the title "McAllister Olivarius TRUTH" in large letters on every page. Id. at Ex. B. It had a home page, as well as pages named "Practice Areas," "Attorneys", and "Contact." Id. The home page

3

displayed a picture of balance scale and the text "HI, MR JEF!" Id.
The "Practice Areas" page was blank. Id. The "Attorneys" page listed
two lawyers with no connection to McAllister Olivarius. See id.; see
also id. at p.6 ¶ 16. This page also displayed the following text:
"When you experience an injury, everything can change – we know that
at Wilson & Doyle. With more than a century of combined experience
litigating on our clients' behalf, you can focus on recovering,
instead of finding yourself overwhelmed and worried about your court
case." Id. at Ex. B. The Contact page included a form for visitors
to send a message. Id. at p.6 ¶ 16.

On July 1, 2016, in response to one of plaintiff's written
demands for payment, Mermel threatened to populate the website with
select documents that, Mermel claimed, "would cast Plaintiff and its
principals in a negative light with 'other potential clients' and
'cripple if not close' its business." Id. at p.7 ¶ 17. Mermel then
offered to forego this plan if "both parties would simply 'walk
away' from the unpaid balance, or, alternatively, plaintiff
[substantially] reduced its balance." Id. at p.7 ¶ 18.

On June 27, 2017, McAllister Olivarius sought leave to amend
its original complaint in New Haven County Superior Court to add an
anticybersquatting claim. Id. at p.7 ¶ 19. Mermel subsequently
removed the website from the internet. Id. at p.7 ¶ 20. On July 24,
2017, plaintiff sought leave to file a second amended complaint,
adding an intentional spoliation of evidence claim. Id. at p.7 ¶ 21.
Mermel opposed. Id. at p.7 ¶ 22. The New Haven County Superior Court

denied plaintiff's request on September 25, 2017, ruling that plaintiff's new claims were insufficiently related to its debt collection claims to warrant joinder in that action. Id. at p.7 ¶ 22. Plaintiff brought the instant action on December 20, 2017. See ECF No. 1.

## DISCUSSION

Defendant, pro se, now moves to dismiss plaintiff's complaint for lack of subject matter jurisdiction and failure to state a claim. See ECF No. 8. When, as here, a party proceeds pro se, a court must liberally construe the party's briefs, "reading such submissions 'to raise the strongest arguments they suggest.'" Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). "The policy of liberally construing pro se submissions is driven by the understanding that '[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" Abbas v. Dixon, 480 F.3d 636, 639 (2d Cir. 2007). Although one suspects that these principles were formulated for the benefit of persons less educated than Mr. Mermel, they nevertheless fully apply here.

## I. Subject Matter Jurisdiction

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) can be granted "when

5

the court lacks the statutory or constitutional power to adjudicate the case." Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996). In reviewing a 12(b)(1) motion, the Court must "accept as true all factual allegations in the complaint and draw all reasonable inferences in the Plaintiff's favor." See Merritt v. Shuttle, Inc., 245 F.3d 182, 186 (2d Cir. 2001).

Defendant's arguments for dismissing under Rule 12(b)(1), even generously construed, are entirely without merit. Mermel first argues that this action is procedurally improper because McAllister Olivarius is the plaintiff and only defendants are entitled to removal under 28 U.S.C. §§ 1441. See 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending."). However, this case does not involve removal. Granted, plaintiff sought to bring this claim in state court, but its request for leave to amend its complaint to include this cybersquatting claim was denied by the Connecticut state court. See Compl. at p.7 ¶ 22. Plaintiff thereafter initiated the instant action in this Court.

Next, Mermel seems to argue that this case does not present a federal question because the "original complaint" – that is, the Connecticut complaint – alleged only breach of contract and quantum meruit. See Memorandum of Law in Support of Defendant Mark Myers

6

Mermel Motion to Dismiss the Complaint ("Def. Mem.") at 17, ECF No. 9. This argument, like the previous one, misconstrues the relationship between this action and the Connecticut action. Although there may be a factual nexus between the two lawsuits, they are procedurally distinct. The cause of action that plaintiff has pled before this Court is based solely on a federal statute, the AntiCybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). The case therefore presents a federal question. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

Mermel's final argument relating to jurisdiction depends on a choice of law provision in the Engagement Letter stipulating that "[a]ny dispute or legal issue arising from these terms of business or the engagement letter will be determined by the laws of the State of Connecticut, without reference to the principles of conflicts of laws of the State of Connecticut." Compl. at Ex. A. As an initial matter, plaintiff's anticybersquatting claim does not "aris[e]" from the terms of the parties' attorney-client relationship or the Engagement Letter. Therefore, the Engagement Letter's choice of law provision does not cover this dispute. Moreover, even if the clause were applicable here, it would govern only which state's law this Court must apply and therefore would not bar this Court's exercise of jurisdiction. See Executive Telecard, Ltd. v. Engelman, 1996 WL 191967, at *3 (S.D.N.Y. Apr. 19, 1996).

## II. Failure to State a Claim

Mermel's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) presents a closer question. To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Mere conclusory statements in a complaint and "formulaic recitation[s] of the elements of a cause of action" are not sufficient. Twombly, 550 U.S. at 555.

In considering a Rule 12(b)(6) motion, while the court generally looks to "the allegations on the face of the complaint," "the court may permissibly consider . . . [d]ocuments that are attached to the complaint or incorporated in it by reference," which "are deemed part of the pleading." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007).

The Anticybersquatting Consumer Protection Act ("ACPA"), enacted in 1999, is intended "to protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks – a practice commonly referred to as 'cybersquatting.'" S. Rep. No. 106-140, at 4; see also Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 493 (2d Cir. 2000)

8

("Cybersquatting involves the registration of domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners."). The ACPA provides:

> A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—
>
> (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
>
> (ii) registers, traffics in, or uses a domain name that—
>
> > (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> >
> > (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; . . . .

15 U.S.C. § 1125(d)(1)(A).

Therefore, "[t]o successfully assert a claim under the ACPA, a plaintiff must demonstrate that (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) the infringer has a bad faith intent to profit from that mark." Webadviso v. Bank of Am. Corp., 448 F. App'x 95, 97 (2d Cir. 2011). For the reasons provided below, the Court finds that plaintiff has plausibly alleged that its mark is distinctive, that defendant's domain name was confusingly similar to

9

its mark and that, on the facts pled, plaintiff adequately has alleged that defendant had a bad faith intent to profit from the mark.

### a. Whether Plaintiff's Mark is Distinctive

Mermel contends that the "McAllister Olivarius" mark is not distinctive, arguing first that the firm's mark is "MCO Law," not McAllister Olivarius, and second, even if the firm's mark were McAllister Olivarius, that mark is not distinctive.

A trademark "includes any word, name, symbol, or device, or any combination thereof" used "to identify and distinguish . . . goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown. 15 U.S.C. § 1127. A service mark similarly identifies and distinguishes the source of one's services from those provided by others. Id.

As an initial matter, plaintiff has pled facts sufficient to give rise to a reasonable inference that it uses McAllister Olivarius to identify itself. Specifically, plaintiff alleges that it has "regularly, continuously, and systematically" used that name since 1996. Id. at p.4 ¶ 6. That the firm also uses the name "MCO Law" does not entail that "McAllister Olivarius" is not entitled to trademark protection, since commercial businesses can, and often do, hold multiple valid and enforceable trademarks. See, e.g., We Media v. General Elec. Co., 218 F. Supp. 2d 463, 465-66 (S.D.N.Y. 2002)

10

("WEM holds several trademarks beginning with the pronoun 'we', including WE and WEMEDIA.").

The level of protection afforded a mark depends on where it falls along a spectrum of "five general categories of distinctiveness: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; and 5) fanciful." Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997). A generic mark is not distinctive and never entitled to protection. See Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 385 (2d Cir. 2005). A descriptive mark is not inherently distinctive, but is protectable if it has acquired secondary meaning. Id. Suggestive marks, along with arbitrary or fanciful marks, are inherently distinctive. Id.

Here, to the extent that the McAllister Olivarius mark warrants any protection, it is only as a descriptive mark. Marks that are "primarily merely surnames" constitute a specific subcategory of descriptive marks, in that they describe the fact that the named individual is affiliated with the firm. Therefore, "McAllister Olivarius," as a descriptive mark, is protectable only if it has acquired secondary meaning. See Pirone v. MacMillan, Inc., 894 F.2d 579, 583 (2d Cir. 1990) (marks which are "primarily merely a surname" are unregistrable unless they have acquired secondary meaning).

Secondary meaning can attach to a descriptive mark where "'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its

meaning as a word identifying that business.'" Time, Inc. v. Petersen Pub. Co. L.L.C., 173 F.3d 113, 117 (2d Cir. 1999) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 390 (2d Cir. 1995)). "[T]he relevant purchasing public is not the population at large, but the prospective purchasers of the product" or service. Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999) (citing Blisscraft of Hollywood v. United Platics Co., 294 F.2d 694, 699 (2d Cir. 1961)).

Courts in this circuit analyze six factors to determine whether a mark has acquired secondary meaning: "'(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use.'" Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 226 (2d Cir.2012) (quoting Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997)). "To establish secondary meaning, a party does not have to prove every factor and no single factor is dispositive." A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC, 131 F. Supp. 3d 196, 212 (S.D.N.Y. 2015) (internal citations omitted).

"[D]etermining whether a descriptive mark has acquired secondary meaning is a fact-intensive inquiry" that is "ill-suited for resolution at the motion to dismiss stage." Id. at 212-13 (internal citations and quotations omitted). "Accordingly, the question of whether a descriptive mark has acquired the secondary

12

meaning necessary to be distinctive generally should not . . . be resolved on a motion to dismiss." Id. (collecting cases). Here, McAllister Olivarius alleges that it has used its mark exclusively for over two decades, including engaging in substantial advertising and marketing of its legal services under the McAllister Olivarius brand through traditional media and the internet. Compl. at p.4 ¶ 6, p.8 ¶ 26. Plaintiff additionally alleges that the firm has received significant media coverage as a result of its work and reputation. Id. at p.4 ¶ 6. Finally, the Complaint includes an allegation that this advertising and press has generated substantial traffic to the Olivarius social media account. Id. Construed in the light most favorable to plaintiff, these allegations give rise to a reasonable possibility that the McAllister Olivarius mark has acquired secondary meaning and, accordingly, is protectable. See, e.g., PGC Prop. v. Wainscott/Sagaponack Prop. Owners, Inc., 250 F. Supp. 2d 136, 143 (E.D.N.Y. 2003) (denying motion to dismiss where plaintiffs claimed that they had advertised on the radio and the Internet, and in newspapers and magazines, using their alleged mark).

### b. **Whether Defendant's Domain Name is Identical or Confusingly Similar**

Mermel also disputes that the mcallisterolivariustruth.com domain name is identical or confusingly similar to the McAllister Olivarius mark. Pl. Mem. at 22. "In the cybersquatting context, 'confusingly similar' must simply mean that the plaintiff's mark and the defendant's domain name are so similar in sight, sound, or

13

Rather, the ACPA creates liability for a person who registers,
traffics in, or uses a domain name that "in the case of a mark that
is distinctive . . . is identical or confusingly similar to that
mark." 15 U.S.C. § 1125(d)(1)(A)(ii) (emphasis added); see also
Coca-Cola, 382 F.3d at 783 ("It is the challenged domain name and
the plaintiff's mark which are to be compared."). Therefore, the
relevant comparison is between the McAllister Olivarius mark and
mcallisterolivariustruth.com.

Mermel contends that his domain name is not confusingly similar
to McAllister Olivarius because it is clear from the domain name
that it is a site for critical commentary. As Mermel explains,
numerous cases have found that attaching the word "sucks" to a
trademark renders the resulting domain name not confusingly similar
to the mark. See Taubman Co. v. Webfeats, 319 F.3d 770, 777 (6th
Cir. 2003); Lucent Techs., Inc. v. Lucentsucks.com, 95 F. Supp. 2d
528, 535 (E.D. Va. 2000); Bally Total Fitness Holding Corp. v.
Faber, 29 F. Supp. 2d 1161, 1164 (C.D. Cal. 1998); cf. Faegre &
Benson, LLP v. Purdy, 447 F. Supp. 2d 1008, 1020 (D. Minn. 2006)
(permanently enjoining defendant from registering or using any
domain name that both incorporates plaintiff's mark and "does not
alert the Internet user to the protest or critical commentary nature
of the attached web site within the language of the domain name
itself"). These courts have explained that the word "'[s]ucks' has
entered the vernacular as a word loaded with criticism," Bally Total

15

Fitness Holding Corp., 319 F.3d at 777, and therefore its combination with a mark eliminates any risk of consumer confusion.

Plaintiff, for its part, points to cases finding that the addition of "generic words" does not create sufficient dissimilarity to avoid liability under the ACPA. For example, the Eighth Circuit has held domain names adding "my," "says," or "drink" to the "Washington Post," "McDonalds," and "Coke" were confusingly similar. See Coca-Cola, 382 F.3d at 784. A court in this District has stated that the similarities between barbiesbeachwear.com and barbiesclothing.com to the BARBIE trademark were "apparent on their face." Mattel, Inc. v. Adventure Apparel, No. 00-CV-1035140, 2001 WL 1035140, at *2 (S.D.N.Y. Sept. 7, 2001). Another has held that that the domain names trumpbeijing, trumpindia, trumpmumbai, and trumpabudhabi are confusingly similar to the Trump mark because "names of places . . . are similar to the types of common words that other courts have held do not distinguish a domain name from a mark." Web-adviso v. Trump, 927 F. Supp. 2d 32, 40-41 (E.D.N.Y. 2013).[2]

---

[2] See also Omega S.A. v. Omega Engineering, Inc., 228 F. Supp. 2d 112, 127 (D. Conn. 2002) (domain names that added the "generic terms" "time" and "watch" to the trademark Omega were confusingly similar); Louis Vuitton Malletier & Oakley, Inc. v. Veit, 211 F. Supp. 2d 567, 578 (E.D. Pa. 2002) (domain name louisvuitton-replicas.com constitutes an identical or confusingly similar use of the Louis Vuitton mark); Shields v. Zuccarini, 254 F.3d 476, 483 (3d Cir. 2001) (finding "strong similarity" between joecartoon.com and joescartoon.com, joecarton.com, joescartons.com, joescartoons.com, and cartoonjoe.com); Volvo Trademark Holding AB v. Volvospares.com, 703 F. Supp. 2d 563, 568 (E.D. Va. 2010) (volvospares.com is confusingly similar to VOLVO).

16

On its face, the word "truth," added to the name "mcallisterolivarius," is not (unlike "sucks") so self-evidently intended as criticism as to warrant dismissal on a motion to dismiss, where every reasonable inference must be drawn in favor of plaintiff. See Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F. Supp. 2d 1032, 1064 (D. Kan. 2006) (concluding the same about the term "exposed," reasoning that "[a]lthough the term 'exposed' may involve critical treatment of a subject, it may not immediately alert an Internet user that he or she is entering a 'gripe site.'"). The Court therefore cannot conclude, at the motion to dismiss stage, that the use of the word "truth" sufficiently distinguishes defendant's domain name from plaintiff's mark.[3]

In short, construing the allegations of the Complaint in the light most favorable to the plaintiff, it is plausible that mcallisterolivariustruth.com is confusingly similar to the McAllister Olivarius mark.

### c. Whether Defendant Had a Bad Faith Intent to Profit

Finally, Mermel argues that he did not act with "bad faith intent to profit" from the mark. The Second Circuit has "expressly note[d]

---

[3] Plaintiff additionally argues that the combination of the word "truth" with the name of a law firm would in fact tend to magnify the potential for public confusion with plaintiff's mark on account of the alleged association, in the mind of the public, between the legal profession and the pursuit of truth. Opp. at 12. While this Court is skeptical that truth is to the legal profession as a rabbit is to a fox, this is, at best, a fact-laden question not suitable for resolution on a motion to dismiss.

17

that 'bad faith intent to profit' are terms of art in the ACPA and hence should not necessarily be equated with 'bad faith' in other contexts." Sporty's Farm, 202 F.3d at 499 n.13. The ACPA lists nine factors that courts can look to as evidence of a bad faith intent to profit, 15 U.S.C. § 1125(d)(1)(B). These factors are:

> (I) the trademark or other intellectual property rights of the person [who registered the domain name], if any, in the domain name;
>
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
>
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
>
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
>
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

15 U.S.C. § 1125(d)(1)(B). According to a leading treatise, "[t]he first four factors suggest circumstances tending to indicate an absence of bad faith intent to profit from the goodwill of the mark, the next four tend to indicate that such bad faith does exist and the last factor points in either direction, depending on the degree of distinctiveness and fame of the mark." 4 McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed.). Additionally, courts "are not limited to considering just the listed factors when making [a] determination of whether the statutory criterion has been met." Sporty's Farm, 202 F.3d at 498. Any "unique circumstances . . . , which do not fit neatly into the specific factors enumerated" may also be considered and may be the "most important grounds" showing bad faith intent. Id. at 499.

Here, three factors straightforwardly weigh in favor of a finding of bad faith and three straightforwardly do not. Factors I, II, and III cut against Mermel. He has no trademark or intellectual property rights in the domain name (Factor I), the domain name does

19

not consist of a name commonly used to identify him (Factor II), and he has not used the domain name in connection with the bona fide offering of any goods or services (Factor III). On the other hand, Factors VI, VII, and VIII weigh against a finding of bad faith intent to profit. Mermel has not registered multiple domain names (Factor VIII) or attempted to transfer, sell, or otherwise assign the domain name to McAllister Olivarius (Factor VI) or any third party for potential gain. There is also is no allegation that Mermel provided misleading false contact information in registering for the domain name (Factor VII).

Factor IV cuts slightly in Mermel's favor. Where a defendant "clearly employed [the domain name] to criticize [the mark-holder's] views," "Factor IV of the ACPA counsels against finding a bad faith intent to profit . . . because 'use of a domain name for purposes of . . . . comment, [and] criticism,' constitutes a 'bona fide noncommercial or fair use' under the statute." Lamparello v. Falwell, 420 F.3d 309, 320 (4th Cir. 2005) (quoting H.R. Rep. No. 106-412, 1999 WL 970519, at *11)). The legislative history reflects that Congress thought Factor IV was necessary to "protect[] the rights of Internet users and the interests of all Americans in free speech and protected uses of trademarked names for such things as parody, comment, criticism, comparative advertising, news reporting, etc." S. Rep. No. 106-140 (1999).

Mermel argues that he used the website for comment and criticism. According to the Complaint, Mermel sent McAllister

Olivarius an email in which he informed the firm that he had
registered the domain name and "threatened" to populate the website
with certain public documents. Compl. at p.7 ¶ 17. In this email,
which is incorporated into the Complaint by reference, see Newman &
Schwartz v. Asplundh Tree Expert Co., 102 F.3d 660, 662 (2d Cir.
1996), Mermel stated that a purpose of the website was "internet
truth telling," Pl. Mem. at Ex. A.[4] He explained that, as part of
this internet truth telling, he would "compile the documented
information from [an ethics] complaint" - information "in the public
record, but not available in one place" - to "form the subject
content of www.mcallisterolivariustruth.com." Id. He further stated
that, "[g]iven that I would not have engaged your firm if I knew its
full history, I think other potential clients would make the same
decision." Id.

The weakness of this argument is that defendant seems not to
have actually used the website for comment or criticism, or at least
that is not apparent from the only facts presently before this Court
on this motion to dismiss. The website bore the title "McAllister
Olivarius TRUTH" but, as discussed, the Court cannot decide at this

_____

[4] Mermel - while also attaching the full email to his motion to
dismiss - objects that the email in which he made this offer was
intended for settlement, and marked "for settlement purposes only,
and therefore should be excluded as evidence under Federal Rule of
Evidence 408. Def. Reply at 19. Plaintiff is correct that the letter
is admissible because it is not being admitted to "prove or disprove
the validity or amount of a disputed claim or to impeach by a prior
inconsistent statement or a contradiction." Fed. R. Evid. 408(a);
see also Fed R. Evid. 408(b) ("The court may admit this evidence for
another purpose.").

21

stage that this phrase is patently critical. The only other portion of the website that Mermel points to as containing commentary about plaintiff is the sentence "Hi Mr. Jef" that appeared on the homepage. Pl. Mem. at 26. While Mermel argues that this phrase "mocked and criticized Jef McAllister by offering the proper form of deferential personal address," id., the use of these three words is, again, not so plainly pejorative as to be construed as such on a motion to dismiss.[5]

Nevertheless, the email laying out Mermel's intention for the website weighs against finding that he intended to divert customers from McAllister Olivarius' website "to tarnish or disparage the mark[] by creating a likelihood as to confusion as to the source, sponsorship, affiliation, or endorsement of the site" (Factor V). In addition, while plaintiff nakedly asserts that defendant intended to "harm Plaintiff's goodwill and cause confusion as to the source, sponsorship affiliation, or endorsement of his website," by "draw[ing] the attention of potential legal clients seeking representation by Plaintiff, [and] intercept[ing] them in their

---

[5] By contrast, courts have found that defendants established websites in order to criticize a business' practices where (i) the website was titled, "My Lucas Landscaping Experience," and included "complaints regarding the poor preparation of the soil prior to Lucas Nursery's laying of the sod, the hasty nature of Lucas Nursery's work," and more, Lucas Nursery & Landscaping, Inc. v. Grosse, 359 F.3d 806, 808 (6th Cir. 2004), and (ii) the website contained defendant's "story of his dispute" with the mark-holder and "a disclaimer at the top of the home page indicating that it was not TMI's site," TMI, Inc. v. Maxwell, 368 F.3d 433, 434-35 (5th Cir. 2004).

search of Plaintiff's website," Pl. Mem. at 13-14, this "formulaic recitation of the elements of a cause of action" is not sufficient, Twombly, 550 U.S. at 555.[6]

Moving beyond the enumerated factors, plaintiff contends that Mermel's bad faith intent to profit from the domain name is demonstrated by his threat to add additional documents to the website that would harm plaintiff unless plaintiff agreed to reduce the amount it was seeking to recover in the Connecticut state court action. See Compl. at p.7 ¶ 17. Specifically, Mermel told McAllister Olivarius that "internet truth telling" was part of his "response" to McAllister Olivarius' efforts to recover its legal fees. Pl. Mem. at Ex. A. He stated further that although he had developed the aforementioned plan to defend himself against McAllister Olivarius, he "would prefer a just resolution," which, in his view, meant that both parties "should both just walk away with [McAllister Olivarius] keeping the over $100,000 [Mermel] ha[d] already paid." Id. He finally offered a payment of $44,293. Id. This is tantamount to a

---

[6] Nor does the website itself, especially when considered in combination with Mermel's email, give rise to a plausible inference that Mermel intended to cause confusion as to the source of the site. Apart from the domain name itself and the "McAllister Olivarius TRUTH" title on every page, none of the website's content would lead an internet user to believe it was McAllister Olivarius' page. Indeed, as noted earlier, the "Attorneys" page of the website included text indicating that the website was for another firm, named Wilson & Doyle. See Compl. Ex. B. Nor is it clear to the Court that there was there anything on the website that would harm plaintiff's goodwill. Cf. S. Rep. No. 106-140, at *6 (Aug. 5, 1999) (citing examples of individuals attaching obscene or pornographic material to an infringing domain name in order to tarnish the mark).

23

request for money in exchange for not developing the website any further.[7]

In other words, Mermel's intent, in plaintiff's view, is to blackmail plaintiff into settling its bill collection efforts. The question then is: Is an intent to blackmail a bad faith intent "to profit," as the statute requires?

That Mermel's offer to settle was noncommercial makes no difference since the ACPA does not require commercial activity or gain as an element of liability. See Hamptons Locations, Inc. v. Rubens, 640 F. Supp. 2d 208, 221 (E.D.N.Y. 2009) ("[T]he prevailing view is that the ACPA does not require a plaintiff to demonstrate defendant's use in commerce."); Bosley Medical Institute, Inc. v. Kremer, 403 F.3d 672, 681 (9th Cir. 2005).[8] Courts accordingly have interpreted the meaning of "profit" in the ACPA broadly. In particular, two Circuits have found the extortionate use of a mark

---

[7] Indeed, while Mermel disputes that he owes McAllister Olivarius "as much as they say he does," he does not dispute that he owes them $88,585. See Pl. Mem. at 25.

[8] The two cases Mermel relies on do not stand for a contrary proposition. While Bosley Med. Inst., Inc. v. Kremer, No. 01-cv-1752, 2004 WL 964163 (S.D. Cal. Apr. 30, 2004), did indicate that the noncommercial use of a domain name could not be the basis for an ACPA claim, this holding was reversed on appeal. See Bosley Medical Institute, 403 F.3d at 680-81 ("[T]he ACPA does not contain a commercial use requirement." (emphasis added)). And Mayflower Transit, LLC v. Prince is distinguishable. 314 F. Supp. 2d 362 (D.N.J. 2004). There, the court found, the defendant established his site exclusively to express dissatisfaction with a company. Id. at 369. Since "genuine cyber-gripers" are not covered by the ACPA, id. at 370, the court found that the plaintiff had not established bad faith intent to profit.

24

sufficient to constitute a "bad faith intent to profit." See Coca-Cola, 382 F.3d at 786 (finding that offer to stop using Washington Post domain names in exchange for space on the editorial page in that newspaper was evidence of bad faith intent to profit, noting that "[p]rofit includes an attempt to procure an 'advantageous gain or return.'"); People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 368 (4th Cir. 2001) (defendant's suggestion that mark owner "make him a [settlement] offer" instead of suing him regarding the domain name in question satisfied the intent to profit requirement); see also Gioconda Law Grp. PLLC v. Kenzie, 941 F. Supp. 2d 424, 437 (S.D.N.Y. 2013) (suggesting that "an extortionate demand" might establish bad faith intent to profit under the ACPA).

It may be argued that even this defendant's conduct and intent, as here alleged, departs from the "heartland" of what the ACPA was intended to cover. See id. at 433. That is, Mermel did not intend to profit by selling the domain name or by diverting consumers to his site so that they would purchase his products. Instead, he sought to profit by diverting customers to his website and then offering to plaintiff that he would refrain from posting true but purportedly damaging documents on that domain name for a price. But this is still well within the plain meaning of the words "a bad faith intent to profit from th[e] mark," and accordingly meets the requirements of the statute.

### d. Whether Defendant's Use of the Mark is Protected by the ACPA Safe Harbor Provision or the First Amendment

Mermel argues that because he "believed that he had the right
to speak the truth," Def. Mem. at 27, his use of plaintiff's mark is
protected by the ACPA's safe harbor provision and the First
Amendment. Under the safe harbor provision, "[b]ad faith intent . .
. . shall not be found in any case in which the court determines
that the person believed and had reasonable grounds to believe that
the use of the domain name was a fair use or otherwise lawful." 15
U.S.C. § 1125(d)(1)(B)(ii). However, this defense "'is not intended
to create a loophole that could swallow the Act by allowing a domain
name holder to evade liability merely by putting up a seemingly
innocent site under an infringing domain name.'" Web-adviso, 927 F.
Supp. at 34 (quoting J. Thomas McCarthy, McCarthy on Trademarks §
25:78 (4th ed. 2004)). "A defendant who acts even partially in bad
faith in registering a domain name is not, as a matter of law,
entitled to benefit from the Act's safe harbor provision." Virtual
Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 270 (4th Cir.
2001).

Finally, even if Mermel's blackmail did warrant First Amendment
protection, courts have held that the First Amendment does not
protect the use of a trademark in a domain name that creates a
likelihood of confusion as to the source or sponsorship of the
attached website. See Planned Parenthood Fed'n of Am., Inc. v.
Bucci, 1997 WL 133313, at *10-11 (S.D.N.Y. Mar. 24, 1997). As the
Fourth Circuit has explained, "[j]ust because an opponent of the war
in Iraq might assert an expressive purpose in creating a website

26

with the name lockheedmartincorp.com, for example, the First

Amendment would not grant him the right to use a domain name

confusingly similar to Lockheed's mark." <u>Coca-Cola</u>, 382 F.3d at 787-

88.

For the foregoing reasons, defendant's motion to dismiss is

denied. The Clerk is directed to close the entry at docket number 8.

SO ORDERED.

Dated:    New York, NY
          April _l_, 2018                    JED S. RAKOFF, U.S.D.J.